12708

BOBER v. SOUTHERN RY. CO. *ET AL.*

(149 S. E., 257)

*Messrs. Barnwell & Black* and *Frank G. Tompkins,* for appellants,

*Messrs. Hyde, Mann & Figg, Logan & Grace,* and *John I. Cosgrove,* for respondent,

July 25, 1929.

The opinion of the Court was delivered by Mr. Acting Justice C. T. Graydon.

A trial of this cause was had before his Honor, Judge W. H. Townsend, presiding Judge, and a jury at the February Term, 1928, of the Charleston Court of Common Pleas. The jury rendered a verdict in favor of the plaintiff for the sum of $7,500 actual damages.

The plaintiff, Stanley J. Bober, was a member of the United States Army, and was stationed at Ft. Bragg, N. C. On November 10, 1923, the football team, composed of members of the United States Army at Ft. Bragg, N. C., journeyed to Charleston to engage the football team of the United States Navy in combat in this magnificent and manly sport. After the game was completed, the football team, of which plaintiff was a member, was transported from the Navy Yard to the Union Station at Charleston, S. C., for the purpose of there entraining for Ft. Bragg, N. C. Upon arrival at the Union Station, it was ascertained by the person in charge of the arrangements that the train had departed, and the football team was ordered to return to the Navy Yard at North Charleston and wait until the arrival of another train. On the return trip from the Union Station the accident occurred from which resulted the injuries to plaintiff.

The principal outlet from the city of Charleston by automobile is Meeting Street, which leads in the general direction of the Navy Yard. From this street or road emerge various State highways leading to points in the upper part of the State. At a point some distance north of the Union Station there is a railroad track which crosses Meeting Street connecting two series of tracks on each side thereof. The truck in which plaintiff was riding was going north on Meeting Street toward the Navy Yard at about 5:30 o'clock on the morning of November 11. At this hour it was admittedly dark.

The truck was being driven at the time by one Bickham, a member of the United States Naval forces stationed at the North Charleston Navy Yard, designated as the person to drive the plaintiff and his team to and from the Union Station.

A train belonging to the defendants consisting of 77 coal cars was moving over this crossing at the time of the accident in a northwesterly direction as the truck in which plaintiff was riding was approaching from the south.

The street car track runs parallel to Meeting Street, and both cross the railroad track at the same point. There is an interlocking device controlled by a watchman in a tower permitting the train to cross at proper intervals upon its approach, and at the same time making it impossible for the street car to cross the railway crossing. By the opposite manipulation, when the street car crosses the railroad track, the railroad train cannot cross the car track. When this interlocking device is operated for the passage of the train, a small red light appears on the north and south side of the railroad track beside the street car track showing the occupancy or intended occupancy of the crossing. From about midnight until an early morning hour the street cars do not run over this line, and the red light appears burning along the street car track during this entire time, for the railroad spur track is open and the street car track is closed.

As before stated, the truck in which plaintiff was riding was proceeding northwardly along Meeting Street approaching this railroad crossing, which was at the time blocked by the train of coal cars of defendant. There was no light over the crossing, and there was no lantern, torch, fusee, or flagman placed alongside the train to warn the public of the approach or crossing of the train. There were no gates at this point, and there was no warning bell or signal device placed by the railroad company at this crossing. The railroad track in question is not a main line, but is merely a transfer track, which is used by the defendants and others

to transfer cars and trains from one set of tracks to the other. The plaintiff was seated on the front of the truck in the lap of a fellow member of his party next to the driver, Bickham. Meeting Street at this point and at this time was paved with Belgian blocks. When the truck was within a short distance of the railroad train, the driver saw the train, and attempted to stop the truck, but failed, finally jumping from the truck himself to a place of safety after he had attempted, unsuccessfully, to apply the brakes. The truck struck the side of one of the coal cars.

There are ten exceptions in number, but only three questions are involved in the case. Exceptions 1 to 5, inclusive, allege error because of the refusal of Hon. T. S. Sease to allow an amendment to the answer of the defendants that the plaintiff was not the real party in interest, but that under the Acts of Congress providing for compensation for injured employees the cause of action must be assigned to the United States government, and, that therefore the United States government, and not the plaintiff, was the real party in interest. At the trial of the case the defendant attempted to introduce testimony as to this matter which Judge Sease had refused to allow by way of amendment to the answer. Judge Townsend refused to allow this line of examination, and, from the order of Judge Sease refusing to allow the amendment to the answer, and the ruling of Judge Townsend refusing to allow testimony as to this issue, the first five exceptions are directed.

The Act of Congress does not provide that the plaintiff must assign the cause of action to the United States Government, but that the United States Government may require the cause of action to be assigned to it under the compensation statute. Under the law of the State of South Carolina, an action in tort before judgment is non-assignable. This, however, is not controlling of the matter, for the reason that, where the United States Government itself requires the assignment, it might be contended with considerable force that

the Federal law would control in so far as it dealt with its own employees. In this case, however, there was no allegation in the original answer on the part of the defendants that the cause of action had actually been assigned and that the government was the real party at interest.

In any event, under the compensation section of the Acts of Congress, the national government is only interested in the cause in so far as it affects the compensation of the individual. It is well recognized even by the Act itself that the amount recovered over and above the compensation belongs to the individual and not to the United States Government. The government merely reserves the right to require the employees to assign the action if it sees fit. Even where the cause of action is assigned to the government by the employee, the action could still be brought in the name of the individual, for the reason that he still has an interest in the claim over and above the amount which the government might be entitled to. This procedure is akin to where a person holds a chattel mortgage which is past due covering a piece of personal property. As a matter of law, the legal title to the personal property, after the mortgage is due and condition broken, is in the mortgagee, but yet this Court has held that the mortgagor still has such an interest in the property that he can sustain an action in his own behalf against an individual or corporation doing damage to the property.

The Courts of this country which have passed upon the identical question have held that the government has no such interest in the claim as would warrant the introduction of testimony or the pleading of such facts as a matter of right. *Gould v. Chicago, B. & Q. Ry. Co.*, 315 Mo., 713, 290 S. W., 141; *Cox v. Detroit United Ry. Co.*, 238 Mich., 527, 213 N. W., 710; *Pettersch v. Grand Rapids Gaslight Co.*, 245 Mich., 277, 222 N. W., 123.

We do not think that the language of the Federal Employer's Liability Act (45 U. S. C. A., §§ 51–59), as applied to the Director General of Railways, is applicable to

the case at bar. We therefore conclude that Stanley J. Bober was the real party in interest, and had such interest in the cause in any event which entitled him to sue in his own name as plaintiff, and that a verdict in such action determines all of the issues finally. These exceptions are therefore over-ruled.

Exceptions 6, 7, 8, and 9 charge error on the part of the Circuit Judge in refusing to grant a non-suit or directed verdict for the defendants.

In considering these exceptions it must be kept in mind that Bober, the plaintiff, was not in charge of the truck. Either he occupied the position of a passenger or he was engaged in a common enterprise with the driver. In the event that he was the passenger, the negligence of the driver cannot be imputed in any particular to him, Bober. The contention that he was engaged in a common enterprise with the driver usually resolves itself into a question of fact for the jury under proper instructions. The jury, by its verdict, found that the plaintiff was not engaged in a common enterprise with the driver of the truck. This finding of fact is well sustained by the evidence. The plaintiff and Bickham, the driver of the truck, were not even members of the same organization. Bickham was stationed at the Navy Yard in Charleston as a member of the Marine Corps, a branch of service under the jurisdiction of the Navy Department. Bober was from Ft. Bragg, N. C., as a member of the Field Artillery, a branch of service under the jurisdiction of the War Department. The plaintiff was being furnished transportation by the Marine Corps, who were charged with the duty of transporting the plaintiff and his companions to and from the railroad station. The charge of the Circuit Judge on this question was more favorable to the defendants than they were entitled to. There was not a particle of testimony that the plaintiff either exercised, or had the right to exercise, any control over the truck. His riding on the front seat was merely a matter of chance. The remaining

members of the team were on the other part of the truck, and the plaintiff, for comfort and convenience, was placed on the front seat in the lap of a companion next to the driver.

In this case the inquiry is, not as to the negligence of the driver of the truck, but as to whether there was any negligence on the part of the defendants, which contributed as proximate cause to the injury, and without which the same would not have occurred. If there was any negligence on the part of the defendants thus contributing, and the driver of the truck was ever so negligent, the plaintiff would still be entitled to recover as a matter of law. The inquiry here then is solely directed to the question of the negligence of the defendants.

Negligence is generally a question of fact to be determined by a jury under proper instructions from the Court. It has been defined as the failure to exercise due care, or that care which a person of ordinary reason and prudence would exercise under the given circumstances. There are a number of facts surrounding this case which the jury might well have taken into consideration in determining the question of negligence. The road in question is one of the most heavily traveled roads in South Carolina. The track in question was not one which was constantly used; it is not a main line or a regular side track. It was used only at intervals to transfer trains and cars from a set of tracks on one side of Meeting Street to a set of tracks on the other side of Meeting Street. When the crossing is to be occupied by a train is not known by the public in general but is known to the railroad company. Under the admitted facts in this case, the crossing in question would have been blocked for a period of several minutes with this train of black coal cars. There was no light over the crossing. There was no warning signal by light, bell, or otherwise placed at the crossing to indicate the presence of a train, and there was no flagman placed out on either side of the train to indicate its presence.

It is true that there was a light some short distance from the railroad crossing along the street car track which showed red. This light, however, showed red during the entire night, and could have constituted no warning to any one of the approach of a train. There was ample evidence to carry the issue of negligence to the jury, and the exceptions imputing error in this regard are overruled. See *Miller v. A. C. L. Ry. Co.*, 140 S. C., 123, 138 S. E., 675, and cases cited.

Exceptions 10 and 11 allege error on the part of the trial Judge in charging certain requests of the plaintiff. These requests were taken from the cases of *Lawson v. Ry. Co.*, 91 S. C., 219, 74 S. E., 473; *Douglass v. Ry.*, 82 S. C., 79, 62 S. E., 15, 63 S. E., 5; *Fitzgerald v. Threshing Machine Co.*, 100 S. C., 439, 84 S. E., 991, and under the authority of these cases these exceptions are overruled.

The defendants had a fair and impartial trial under a comprehensive charge by an able Circuit Judge. There was ample evidence to sustain the finding of the jury in favor of the plaintiff.

Judgment affirmed.

Messrs. Justices Stabler and Carter concur.

Mr. Justice Blease concurs in result.

Mr. Chief Justice Watts did not participate.

Mr. Justice Cothran (dissenting): The undisputed evidence establishes the fact beyond the peradventure of a doubt that, as the driver of the truck crossed the Coast Line spur track, which crossed Meeting Street road, upon which he was traveling, 220 feet from the crossing of the Southern Railway and the Coast Line joint spur track, where the collision occurred, he saw the Southern coal train in the act of crossing Meeting Street road; he saw it so plainly that he could discern the white letters and figures upon the coal cars as they were passing.

This fact absolutely eliminates all charges of negligence on the part of the railroad company, based upon its failure

to give notice by watchman, flag, gates, or lights, of the occupation of the crossing by the train.

In the case of *Gibson v. R. Co.*, 110 S. C., 331, 96 S. E., 519, 520, in an opinion by the present Chief Justice, it is said:

"* * * The evidence in the case admits of no other inference than that neither a watchman nor gates at the crossing could have prevented the plaintiff from running into the train. The sole proximate cause of plaintiff's injury was his lack of care and his failure to observe the ordinary precaution in crossing the railroad track. The plaintiff saw the train crossing and actually occupying the track. His own reckless conduct was the direct and proximate cause of his injury. He saw the train when he was at least 150 feet from it. He did not stop, although he could have done so, and made no effort to stop it. He thought by timing his movements and still running his automobile the train would pass over the crossing before he reached it. He had defective lights on his car. The only inference that can be drawn from the evidence is that not the failure to have gates or a watchman at the crossing or the high rate of speed of the train, but the careless, reckless conduct of the plaintiff, was the cause of his injury. The plaintiff can have no recovery under the facts of the case and under *Barber v. Railroad Co.*, 34 S. C., 444, 13 S. E., 630; *Cable Piano Co. v. Railroad*, 94 S. C., 145, 77 S. E., 868."

In the *Barber case*, 34 S. C., 444, 13 S. E., 630, 632, cited by the Court in the case last referred to, the Court by Justice McIver, later Chief Justice, said:

"Now, in this case while there was evidence of negligence in failing to give the statutory signals, which would have made the defendant liable if the disaster had occurred at a public highway or street or travelled place, provided it had been shown that the injury complained of resulted from such negligence, yet, as we have said, the disaster did not occur at any such place, and, if it had, how could it be said that

the injury was the result of such negligence, in face of the admitted fact, testified to both by the party injured and by his companion, that young Barber knew that the train was not only approaching, but was near at hand, before he started from the fire? The manifest object of requiring the signals is to give notice to persons crossing or wishing to cross a railroad track, in order that they may keep out of the way of an approaching train; but if they know of the approach of the train without any signal being given, where is the necessity for such signals, and how could it be said with any propriety that the failure to give them contributed in any way to the disaster?".

In *Griskell v. R. Co.*, 81 S. C., 193, 62 S. E., 205, 207, it was said:

"Conceding that defendant was negligent in not giving the statutory signals, this could not have been a proximate cause of the injury, since intestate heard the station blow, saw the headlight, and was racing to beat the train to the depot"—citing the *Barber case*.

It also appeared by uncontroverted testimony that as the truck passed over the Coast Line spur track, and the driver saw the train upon the crossing, he slowed down to about 10 or 15 miles an hour, evidently having complete control of his car for practically 200 feet; he slowed down, but did not attempt to stop, as it was unnecessary at that distance; as he approached the slowly passing train, and had come within a short distance of it, naturally difficult of exact ascertainment, he attempted to apply the foot brake, and in his own language this is what occurred:

"Q. When you saw the train on the track, what did you do? A. Applied my brakes, and they seemed to hold and *then gave way.*

"Q. Then what did you do? A. I applied the emergency brake and holloed to the men to jump, *the brakes would not hold;* I tried to turn to the left to avoid the accident and hit the train. * * *

"Q. Did you apply the brakes on your truck as soon as you saw the train? (Which was 220 feet away, according to his testimony that he saw it as he crossed the Coast Line spur, in connection with the plat introduced by the plaintiff showing that to be the distance.) A. Yes, sir.

"Q. What was the result of that? A. *The brakes failed.*

"Q. When they failed was or not the truck out of control? A. It was not out of control, but it seemed it would not stop.

"Q. Did you examine the foot brake right after the accident? A. Yes, sir.

"Q. What condition did you find it in? A. Loose. * * * Three threads was stripped from the end of the rod. * * * That pulled the brake loose .

"Q. Pulled it out of the clevis? A. Yes, sir. * * *

"Q. If your brakes had been in good condition, is there any reason why you could not have prevented the accident? A. I don't know, that is a rough road, possibly I could have stopped the truck and possibly I could not.

"Q. If the brakes had been in good condition you could have averted the accident? A. *That is my idea.*"

A weak effort was made to have the witness say that the defect in the brake was possibly caused by the collision. Whether the defect discovered was caused by the collision or not is of no consequence, in view of the testimony of the witness that the brakes for some reason refused to work when the first application was made at the Coast Line spur; and their inefficiency was so great that he called to the passengers on the truck to jump, which of course preceded the collision.

Mr. Wait, general manager of the Port Utilities Company, a mechanical engineer who had examined the truck and had examined the tension rod before the board of inquiry held at the Navy Yard just after the collision, and had tested the brakes and the rod on the truck in the presence of the board, testified as follows as to his opinion concerning the cause of the accident:

"Q. From your knowledge and experience and examination of the tension rod and the truck, what is your opinion as to what happened there? A. The application of the brakes stripped off the clevis from the tension rod.

"Q. What would be the effect of that on the brakes? A. The instant the foot-pedal was released the brakes on the truck would be released.

"Q. What effect would the failure of the brakes have on the power of the driver to control the car? A. This tension rod I examined applied only on the foot brake. *He had no control over stopping the car with the foot brake.*"

He testified further:

"Q. It has been suggested here that it might have been possible for the condition of the clevis and tension rod to have been produced by the lick, what do you say about that? A. I cannot conceive of any force that could be brought to bear on the foot pedal that would strip the threads off the clevis or the nut."

It seems indisputable, therefore, that the driver saw the train upon the crossing in plenty of time to stop his truck and could have done so but for the defective brakes. To hold the railroad company liable for an act not attributable to any act of negligence on its part, but to the admitted failure of the brakes of the truck, appears to me to be great injustice.

In the case of *Keel v. Railway Co.,* 122 S. C., 17, 114 S. E., 761, 762, the trial Judge directed a verdict for defendant, and plaintiff appealed. The facts are thus stated in the opinion of the Court:

"The deceased at the time of the unfortunate occurrence was riding in an automobile, traveling in Third Street and making for the crossing from the west side. The evidence adduced by the plaintiff shows that at a point ten or fifteen feet before the car reached the house track the driver saw the train coming and slammed on the brakes; that the car did not respond to the application of brakes, but the wheels skidded, and the car drifted across the passing track and ran

into the third car from the engine as the train passed on the main line, occupying the crossing. At the point at which the brakes were applied the car was at least 37 feet from the center of the main line. That it could ordinarily have been stopped or turned aside within that distance cannot be controverted."

In sustaining the judgment for the defendant, the Court said:

"The evidence shows that the occupants of the car were fully advised of the approach of the train in ample time to have stopped the car or turned it aside; that their failure to do so was due to a defect in the brakes by which the car not be prevented from drifting along and actually running into the train. The illustration of the runaway horse given by the learned Circuit Judge is apt. The law of proximate cause requires an unbroken sequence between the prime act of negligence and the injury; and when it appears that an active cause intervened between the prime act and" the act producing "the injury, the prime act will not be deemed the proximate cause unless it appears that the intervening act was itself a result reasonably to have been expected from the prime act, in which case the connection between the prime act and the injury is maintained—the sequence is not broken. See the very clear statement upon the subject in *Sandel v. State*, 115 S. C., 177, 104 S. E., 567, 13 A. L. R., 1268.

"It is clear that the immediate cause of the injury was the defect in the brakes which prevented the occupants of the car from availing themselves of the knowledge of the train's approach."

It is contended for the plaintiff that the stop was an emergency stop, not a "premeditated" one; that the emergency was created by the negligence of the railroad company; that the haste produced by the emergency caused the disruption in the stopping apparatus; and that, therefore, if

there was a failure of the brakes to operate, that failure was a proximate result of the negligence of the railroad company.

The argument is ingenious, and would command attention, if the premises be admitted. As a matter of undisputed fact, there was no such emergency; the driver had 220 feet within which to slow down and stop. It does not appear that he was thrown into such a panic as to slam the foot brakes on in such a manner as to disrupt a normally appointed apparatus. He appears to have taken his time in slowing down and in applying the foot brake, and evidently continued his efforts until he saw that he could not stop the truck with it, and then applied the emergency brake too late.

There was abundant evidence in the case tending to show that the railroad company had an elaborate system of interlocking switches to provide for the occupation of the crossing by a train to the exclusion of travelers on the highway or of cars on the electric line which paralleled the highway; that there were red signal lights both north and south of the crossing which streamed upon the highway toward the south, the direction from which the truck was coming. It is true that the driver of the truck claims not to have seen these signals of danger, but he admits, as the evidence shows, that he saw the train moving slowly over the crossing, occupying it for the time being, and it is immaterial whether he saw the red lights or not.

Under the view of the facts which I take, it is not necessary to consider the issue whether the driver of the truck was guilty of negligence and the issue whether the negligence of the driver of the truck was imputable to the plaintiff. In my opinion, the evidence conclusively shows, regardless of these considerations, that the cause of the collision was the defective equipment of the truck, for which neither the driver nor the railroad company was responsible.

I think, therefore, that the motion of the defendants for a directed verdict should have been granted, and that the case should be remanded to the Circuit Court, with directions to enter judgment in favor of the defendants under Rule 27.