14689

KNEECE *ET AL.* v. SOUTHERN RY. CO. *ET AL.*

(197 S. E., 673)

*Messrs. Hendersons & Salley* and *Frank G. Tompkins,* for appellants,

*Messrs. Williams & Busbee,* for respondents,

May 24, 1938.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This action, one in which both actual and punitive damages were sought, was brought for the benefit of the mother of one W. L. Kneece, deceased, who met his death on the night of April 13, 1935, when his automobile, in which he was riding alone, ran into a freight train of the defendant company at a highway crossing in the town of Monetta, in Aiken County. The railroad, which runs north and south through the village, crosses paved highway No. 39, running east and west, within the limits of the town. The paved portion of this highway is eighteen feet wide and is straight from highway 23—which runs west of the town—for about one-third of a mile to the crossing.

The deceased at the time of his death was nineteen years old, and lived with his mother on her farm about five miles east of the village of Monetta. On the night in question, he went in his Ford car to visit a young lady in the town of Batesburg. Some time during the evening they drove to the home of Miss Elizabeth Warren, who lived about a mile and a half west of Monetta. At the conclusion of their visit, they returned to Batesburg, where the young man stayed until shortly after twelve o'clock, when he went back to the home of Miss Warren for the purpose of taking to her a pair of gloves. He left there, after a short time, for his own home going by the way of and entering Monetta on highway 39 from the west. The boxcar of the freight train with which he collided at the crossing was loaded with lumber. About 6.30 o'clock that morning, the dead body of Kneece and his wrecked automobile were found together just beyond a mail

crane, which was about eighty-seven feet north from the center of the paved highway, and which "had been knocked down and was torn up."

The plaintiffs alleged that the train in question, traveling north, arrived at Monetta about 12:45 in the nighttime on the date named, and that the defendants caused such train to stop over and upon the said crossing, completely obstructing the public highway for an unreasonable length of time, and failed to use such precautionary measures as were necessary and proper in the circumstances to prevent injury to the traveling public; the death of plaintiffs' intestate being due, it was charged, to the negligent, reckless and willful acts and conduct of the defendants, in the following particulars:

"(a) The defendants, without placing any warning, either light, person or signal, left the train of cars above mentioned across the highway and street aforesaid for fifteen or twenty minutes, an unreasonable length of time, knowing that said public highway was extensively travelled and that it was dangerous to leave said train across said crossing as aforesaid, although it was the duty of the defendants and a rule of the defendant railway company not to obstruct said crossing with the said train of cars, without leaving some warning to protect said train, and without leaving lights or a trainman to warn travellers upon said highway and street crossing.

"(b) Defendants sent the flagman back beyond the rear of the train with the lights and sent the brakeman with the shifting part of the train, and left no one to protect the train at said crossing, in violation of the rule quoted herein and in violation of their duty to plaintiffs' intestate and others travelling said highway.

"(c) And after plaintiffs' intestate, not warned or conscious of the presence of said train, so obstructing said highway and street as aforesaid, ran into and under one of the freight cars across said street and crossing; and was stunned, and there held disabled, in that condition and

dangerous predicament, by being wedged and fastened thereunder, in violation of the rules governing the conduct of the defendants and in breach of their duties to plaintiffs' intestate and the public using and travelling said highway and street, a street and highway that had been travelled for more than twenty years next before said date, so known to the defendants, the engineer in charge of said shifting part of the train and the conductor in charge of the dead train, ran said train back to and coupled it with that part of the train across and obstructing said street and crossing, and pulled the same away without having any trainmen, signal or other thing or person to protect said obstructing portion of the train or crossing, either when running the same back thereto or previous to that time, and coupled the same with said obstructing portion of the train and pulled the same away on its journey towards Batesburg, and thereby in the manner aforesaid, carried plaintiffs' intestate's automobile and plaintiffs' intestate along therewith until it reached a mail crane post, where the automobile lodged against said crane post and the train demolished the automobile and further injured the plaintiffs' intestate, from all of which injuries plaintiffs' intestate some time before daylight died; but said train went on its way toward Batesburg with the wheels of one of the freight car trucks running on the cross-ties without even pretending to know that anything had happened out of the ordinary."

The answers of the defendants, in addition to setting up a counterclaim for alleged damages done to about five miles of the company's railroad track, as a result of the derailment of one of its cars, a part of the train in question, interposed a general denial and pleas of contributory negligence and of willfulness and wantonness. The specifications of these pleas were to the general effect that the plaintiffs' intestate operated his automobile, at the time named, without keeping a proper lookout for the train, at a high and excessive rate of speed and in violation of the twenty-mile speed limit which was in effect in the town of Monetta; and that he drove

his car "with terrific force and without proper brakes and without proper lights into the train of the defendant company."

On trial of the case, in June, 1937, the defense, at the close of all the evidence, moved for a directed verdict upon the following grounds: (1) That there was no proof of any actionable negligence, or of any recklessness or willfulness, on the part of the defendants; (2) that the "only reasonable inference to be drawn from all of the testimony presented herein is" that plaintiffs' intestate was guilty of contributory negligence, and of contributory recklessness and wantonness, in the respects set out in the answers filed. The Court granted the motion as to punitive damages; but submitted the question of actual damages to the jury, and on that issue the plaintiffs were awarded the sum of $6,300.00. From the verdict thus rendered and judgment entered thereon, this appeal is taken.

There are two exceptions, the first of which renews here the grounds of defendants' motion and charges the trial Judge with error in not directing a verdict, while the second has to do with the admission of certain testimony. The question of actionable negligence, which we will first consider, is argued by counsel for appellants from two angles. They contend, in the first place, that testimony offered by them on trial of the case, in the nature of figures and measurements, conclusively showed that the accident occurred before the train stopped, and hence before it could have been split or flagmen or lights posted. The correct answer to this contention will be found in the testimony, to which we now turn, keeping in mind the principles that a trial Court will refuse to direct a verdict where the evidence is susceptible of more than one reasonable inference.

Jeff Anderson, a witness for the plaintiff, testified that he was living "where roads No. 23 and No. 39 go together. When a fellow turns and goes in the road, if you are in the house at night, you can see the lights reflected on the window. On this occasion and before the

wreck I saw some lights reflect on the window. The car was going about 18 or 20 miles an hour. After so long a length of time I heard a noise. It sounded like a crash or something like that. I heard the train when it come into Monetta—that was before I heard the crash. Q. That car that reflected on your window, did it have about time to get to the crossing when you heard the crash? A. Yes, sir. The train had been there before I heard the crash about 15 or 20 minutes. I heard the train leave and it made a little unusual noise than it had been making, a kind of bumping like. That was the same night that Mr. Kneece was killed. I heard about it the next morning."

J. H. Watson stated that he made a casual examination of the place where he thought the automobile came in contact with the train; that he saw there, one or two feet north and west of the track of the railroad at the crossing, a pool of oil about ten or twelve inches in diameter. Mr. and Mrs. J. T. Lybrand testified to the same effect. L. J. Kneece said that "up to the crossing at the highway was a big puddle of oil like it run off, and a little stream followed the car down to where it was turned over"; and that this puddle was on the pavement. J. P. Kneece testified that "there was a puddle of oil in the road and practically in the middle. It was about ten feet from one edge and seven feet from the other." The testimony of these witnesses, while circumstantial, tended to corroborate the positive testimony of Anderson that the train was at the crossing some fifteen or twenty minutes before he saw the reflected light of an automobile and heard a noise that sounded like a crash. The jury might have reasonably inferred therefrom that the Ford, as contended by the respondents, was wedged under the boxcar in the collision, and was held at the crossing, the oil leaking out at that point, until dragged by the train from the paved highway to the mail crane, as indicated by a thin stream of oil along the way.

We have examined with care the testimony of the witnesses for the defendants, reduced to a formula of figures

and measurements, and relied on by the appellants as exclusively showing that the train was moving at the time the collision occurred. While tending to support this contention, it is not at all conclusive of the question. Certainly, the trial Judge could not have held, as a matter of law, that the testimony was susceptible of no other reasonable inference. This question, under all of the evidence, was undoubtedly for the jury and was properly submitted to them.

The appellants contend, however, as stating their second position, that even if the train was at a standstill on the crossing at the time of the collision, it is not reasonably inferable from the testimony that the defendants were guilty of any actionable negligence in what they did or in what they failed to do. In this connection, they cite several decisions of the Court as showing the existence of peculiar circumstances or special conditions where the question of actionable negligence in a case of this kind was held properly submitted to the jury, and argue that no such circumstances or conditions exist in this case.

We will not detail at length the testimony pertinent to this issue. Briefly stated, it is not disputed that the defendants knew they were blocking in the nighttime a much-traveled State highway. Admittedly, they kept the train on the crossing for fifteen minutes, and did not cut or split it so as to clear the highway, although this could have been quickly done. The town of Monetta had no street lights, and the defendants provided none themselves at the point in question, or put out a flagman or employed any other means of warning the traveling public of the train's presence across the highway. In other words, they left the crossing, in the circumstances stated, unlighted and unguarded. On that night the moon was shining; and there was testimony to the effect that certain conditions existed near and about the crossing, such as the casting of shadows by trees growing thereabout, which tended to mislead and deceive a traveler approaching upon the highway from the west as to the presence of a train on the crossing until he was in close proximity thereto.

With regard to the rules of the company introduced in evidence by the plaintiffs, the Court charged the jury that Rule 1152, which provides that "they (conductors) must not obstruct streets or highway crossings for more than five minutes," was for the benefit of the traveler on the highway who might be delayed for more than five minutes by the train blocking the crossing. Whether this is a correct construction of the rule or not, it became the law of this case, and the contention of the respondents thereabout need not be considered. The appellants urge that the time element alone should not be the deciding factor in this case, as it is not made to appear that the length of time the train remained on the crossing was the proximate cause of the death of the deceased. We think, however, an issue was made for the jury as to whether, under the facts disclosed by the testimony, it was an unnecessary and unreasonable length of time; and as to whether the defendants, in the circumstances, were guilty of negligence in failing to take precautionary measures, such as the posting of flagmen or of lights, for the protection of the traveling public.

In *Miller, Administrator, v. Atlantic Coast Line R. Co.,* 140 S. C., 123, 138 S. E., 675, where the deceased ran into a standing train at a crossing and was killed, this Court held that (page 689) "a railroad owes a duty to the public of not obstructing a highway, which crosses it, unnecessarily or unreasonably," and that "the public has a right to be protected where a highway crosses a railroad track." In *Funderburk v. Powell et al.,* 181 S. C., 412, 187 S. E., 742, a recent decision of this Court, after stating the facts inferable from the testimony, Mr. Justice Fishburne, the writer of the opinion, said (page 746) : "The Court is not holding that the mere blocking of a railroad crossing by a train, under the facts disclosed here, constitutes *prima facie* negligence— nothing else appearing. It is an axiom that the facts speak the law, and the decision in each case must depend upon its own peculiar facts and circumstances. The submission to the jury of the question of actionable negligence here was

proper. The inferences to be drawn from the facts were in doubt." And we so hold in the case before us. The trial Judge could not say as a matter of law that the defendants were not guilty of actionable negligence. Under the conflicting testimony, that question was properly for the jury. See, also, the following decisions: *Pinckney v. Atlantic Coast Line R. Co. et al.,* 147 S. C., 227, 145 S. E., 135; *Bober v. Southern Railway Co. et al.,* 151 S. C., 459, 149 S. E., 257; *Lawrence v. Southern Railway Co.,* 169 S. C., 1, 167 S. E., 839; *Myers v. Atlantic Coast Line R. Co.,* 172 S. C., 236, 173 S. E., 812; *Spiers v. Atlantic Coast Line R. Co.,* 174 S. C., 508, 178 S. E., 136. While it is true that the facts of these cases differ somewhat from those disclosed in the case at bar, as stated in *Funderburk v. Powell, supra* (page 746), "their points of departure are not nearly equal to their points of contact."

We think, under the testimony and applicable principles of law, the trial Judge properly refused to direct a verdict for the defendants on this ground. Whether they were guilty of common-law negligence, in the circumstances shown, was a question for the jury.

We come now to the second question: Was the plaintiff's intestate guilty of contributory negligence?

Counsel for the appellants argue with much earnestness that the testimony shows conclusively that the deceased was the author of his own injury and death, or contributed thereto as a proximate cause thereof, and that the trial Judge committed error in not directing a verdict on this ground of their motion.

There was much testimony bearing upon this issue, and much of it in sharp conflict upon material points. It is not disputed that highway 39 from road 23 is downgrade for some distance, and from the low point to the crossing it is upgrade. There was evidence tending to show that the freight car with which the Ford collided had a clearance from the top of the rail to the bottom of the car sill of thirty-

three inches; and that one approaching on highway 39 from the west, because of the upgrade, would look under the boxcar on the crossing to the sky beyond, and for that reason such car would not be seen, especially on a moonlight night, until the approach thereto was close. There was also testimony to the effect that trees on each side of the highway cast shadows and formed a dark background, making it difficult to see a freight train standing on the crossing. A number of witnesses for the plaintiffs testified as to this situation. Some of them stated that they had made tests in order to determine how far a boxcar standing on the crossing could be seen on a moonlight night, the approach thereto being made on highway 39 from the west. One of them said that, due to the upgrade of the highway at the point named and of the shadows cast by the trees, it was difficult to see such car until you were close to it, even though you were looking for it. Others testified, each in his own way, practically to the same effect.

Counsel for the appellants contend, however, that the injury and death of Kneece were due to "a terrific rate of speed" at which the young man was driving his automobile at the time of the accident, and to his failure "to take proper precautions to discover the approach of or the presence of a train upon the crossing, although he knew that it was train time." The claim as to the high rate of speed is based upon the fact that the skull of the deceased was found crushed and his automobile was a total wreck, when they were discovered the next morning near the mail crane. Counsel for respondents counter by saying that there was testimony which tended to show that Kneece was not driving his car at more than eighteen or twenty miles per hour; and that a reasonable inference from the evidence is that he was not killed, although seriously injured, when he collided with the train at the crossing, but that the automobile was wedged under the boxcar in such a way that the deceased could not extricate himself therefrom, and that thereafter the defendants, without any inspection of the crossing, drove their

train on toward Columbia, dragging the Ford and its occupant along with it until they came in contact with the mail crane, which resulted in the complete wrecking of the automobile, the crushing of the skull of the deceased, and the derailment of the boxcar itself. In support of this view, they point to testimony for the plaintiffs that the deceased, when his body was found the following morning, had a bloody handkerchief in his hip pocket, from which counsel argue it is reasonably inferable that Kneece had used it to wipe the blood from his face after he was injured at the crossing; and that he could not have done this after his skull was crushed, as the medical examiner testified that he never regained consciousness after that happened.

Many witnesses testified and much conflicting evidence on this issue, as we have said, is found in the voluminous record for appeal. We deem a further review of it, however, unnecessary. It is sufficient to say that more than one reasonable inference can be drawn therefrom as to the contributory negligence of the deceased, which required the submission of that question to the jury. The trial Judge, therefore, committed no error in refusing to direct a verdict for the defendants on the second ground of their motion.

When R. H. Buff, a witness for the plaintiffs, was on the stand, he stated that he was a mechanic, with two and a half years' experience with the government during the war and thirteen years in private business as a public garage man, and that he was familiar with the adjustment of brakes on automobiles. He was then asked the following question: In driving an automobile twenty miles an hour, about thirty feet per second, should you be confronted with some object that requires you to stop your car, "what interval will actually elapse before your brakes can actually take effect?" Counsel for the defendants objected on the ground that the witness was "not an expert on a man's mind," and that "what occurs to his mind or his opinion is not pertinent in this case." The objection, however, was overruled and Buff was allowed to answer.

The contention of the appellants that the trial Court erred in the admission of this testimony, is not without some merit. It appears that what the witness stated was merely the expression of an opinion on his part, and it is not clear that he had qualified as an expert for that purpose, even if he could have done so. However, the defendants have no good grounds for complaint. They proceeded to cross examine Buff along the same line, without any reservation as to their objection. Also, they later brought out from their own witness, J. L. Eubanks, somewhat similar testimony. Furthermore, if the testimony excepted to is disregarded by the Court, as requested by the appellants, the conclusions reached would remain unchanged.

The judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on acount of illness.