15794

NESMITH v. ATLANTIC COAST LINE R. CO. *ET AL.*

(36 S. E. (2d), 581)

*Messrs. Hagood, Rivers & Young,* of Charleston, Counsel for Appellant,

*Messrs. J. C. Long* and *Arthur Rittenberg,* both of Charleston, Counsel for Respondent,

January 21, 1946.

Mr. Associate Justice Oxner delivered the unanimous Opinion of the Court.

This action was brought by respondent Cunail Nesmith, to recover damages to his automobile and for personal injuries sustained growing out of a collision between said automobile and a moving freight train of appellant, Atlantic Coast Line Railroad Company, which occurred about 4:30 A. M. on August 22, 1941, at a crossing approximately eight miles north of the City of Charleston on U. S. Highway No. 52. The action was brought against the Railroad Company and the engineer and condutcor of said train. The trial resulted in a verdict for $5,083.33 actual damages against the Railroad Company alone, which has appealed from the judgment entered on said verdict. There are only two questions to be determined: (1) Did the lower Court err in refusing a motion for a directed verdict and a motion for judgment *non obstante veredicto* on the ground that the driver of the automobile was guilty of negligence which was the sole cause, or contributed as a proximate cause, of the collision? (2) Did the lower Court abuse its discretion in refusing to grant a new trial on the ground that the verdict was so excessive as to show caprice, passion and prejudice on the part of the jury?

U. S. Highway No. 52 runs north and south and is a four-lane highway constituting the main thoroughfare for traffic going north from the City of Charleston. There are two lanes for northbound and two for southbound traffic which are separated by a wide area. The travel along this highway is exceedingly heavy. It is intersected at approximately right angles by a spur track of appellant. This spur track extends east and west and runs from appellant's main line to the Cooper River. The crossing in question is just south, and at the foot, of a viaduct. The view of the cross-

ing by one traveling along the highway toward Charleston and approaching from the north is obstructed by the viaduct until he reaches its crest, at which point he is usually able to obtain a clear view of the crossing below. There is a sharp descent around a curve from the top of the viaduct to the crossing.

Respondent, a Negro, resided in Williamsburg County and his home was approximately 80 miles from Charleston. On the day before the collision he and another Negro, Donald Cunningham, left their home and drove in respondent's car to Charleston for the purpose of securing work at the Navy Yard. Neither had ever been to Charleston before this time. Respondent drove the car and in going and returning on this trip passed over the crossing in question when it was dark. The next morning they left home about 1:30 A. M. to report for work. Respondent's father accompanied them on this trip for the purpose of also trying to get work at the Navy Yard. This was his first visit to Charleston. Respondent again drove the car on this occasion until they entered the dual-lane highway at a point about seven miles from the crossing, where Cunningham commenced driving. Respondent sat beside him on the front seat and in a few minutes went to sleep. His father was on the rear seat. The night was dark and there was intermittent fog along the highway. They were traveling in a southerly direction. Cunningham testified that he drove at the rate of about 25 or 30 miles an hour until he reached the crest of the viaduct; that as he descended on the other side he ran into a pocket of fog which was very dense, making it impossible to see more than five or ten feet ahead; that he then slowed down to 15 or 20 miles an hour; that he did not realize he was approaching a railroad crossing; that suddenly there appeared an obstruction in front of 'the car, whereupon he applied his brakes and swerved to the right in order to avoid the obstruction but was unable to do so; that he did not recognize that this obstruction was a

train until the collision occurred; that the car was equipped with good brakes and its headlights were burning; that the fog was so dense at this point it was impossible to see the railroad crossing signs which had no reflectors; and that there were no lights, signals or other warnings of any kind at the crossing. Respondent was asleep when the collision occurred. His father corroborated the testimony of Cunningham.

The freight train consisted of 29 cars, some of which were boxcars and others empty flat cars. The engine was traveling backward, the front being coupled to the cars which were being pulled in a westerly direction toward the main line. The engineer testified that the train was "practically stopped" when it reached the crossing and moved over the crossing at a speed of six to eight miles an hour. The conductor estimated the speed at four miles an hour. The point of collision was at the end of the seventeenth car from the engine, which was an empty flat car about four and a half feet high. No member of the train crew saw the collision and the train proceeded about a quarter of a mile before it was stopped. The testimony of the occupants of the car as to the density of the fog at the crossing was corroborated by two members of the Charleston County Police Department who arrived at the scene only a short time after the collision, one of whom testified that the train could not have been seen until a person was "pretty close to it." The other described the condition of the weather as follows: "Very foggy. Couldn't see ten feet ahead of you at one place, then ride on a few feet and get a clear place in the road."

It should be added that the members of the train crew testified that a lighted fusee was placed on each side of the crossing before the train passed over. Cunningham and respondent's father testified that there was no fusee or other light burning at the crossing and their testimony was corroborated by that of the two police officers above referred to. One of these officers made a search at the scene of the

collision and could find no evidence of a fusee or the remains of one. The jury evidently determined this issue of fact adversely to appellant and for the purpose of this discussion we must accept the version of respondent's witnesses.

The lower Court held that any negligence on the part of the driver would be imputed to respondent. Respondent did not appeal from this ruling. No question is raised in appellant's brief as to the sufficiency of the evidence to show actionable negligence on the part of the Railroad Company. Appellant's counsel frankly conceded in oral argument that there was sufficient evidence to require the submission of this issue to the jury. We are, therefore, only required to determine whether as a matter of law the driver of respondent's automobile was guilty of negligence which solely caused the collision or contributed as a proximate cause thereof. We think this question was properly submitted to the jury.

The driver did not approach this crossing on a level road where the lights of an approaching train could have been seen. The view of the track by anyone traveling in this direction even when weather conditions were good would have been obscured until he reached the crest of the viaduct. When the driver of respondent's car reached this point the engine must have already passed the crossing and gone a considerable distance beyond. There is no evidence that the driver could have seen the lights of the engine at this time. There were no reflectors on the crossing signs and the jury could have concluded from the evidence that the fog was so dense ordinary crossing signs without reflectors could not have been seen. There was nothing else to indicate to a traveler that he was approaching a crossing or that it was blocked by a slowly moving train. The fog was not continuous. The driver ran into this heavy pocket of fog after he started down the viaduct and was near the crossing. None of the occupants of the car were familiar with the road and none know that they were approaching a railroad cross-

ing. As soon as the driver ran into this pocket of fog he immediately reduced his speed. The train was moving so slowly that the jury could have inferred that the noise of the moving train was too slight to be heard. Appellant's counsel argue that the car was being driven at too rapid a rate of speed which caused the collision or contributed as a proximate cause thereof. We cannot say under all the circumstances that a speed of from fifteen to twenty miles an hour at this point was excessive as a matter of law.

Our conclusion that the respondent's driver was not guilty of contributory negligence as a matter of law is sustained by the following cases: *Spiers v. Atlantic Coast Line Railway,* 174 S. C., 508, 178 S. E., 136; *Kneece et al. v. Southern Railway et al.,* 187 S. C., 195, 197 S. E., 673; *Bingham v. Powell et al.,* 195 S. C., 238, 11 S. E. (2d), 275; *Crapse v. Southern Railway,* 201 S. C., 176, 21 S. E. (2d), 737. In the case of *Brown v. Powell et al.,* 198 S. C., 403, 18 S. E. (2d), 212, strongly relied on by appellant, an automobile driven from thirty to fifty-five miles an hour collided with a standing train which blocked a crossing, resulting in the death of the driver. In a suit against the Railway Company for wrongful death, it was held that the driver was guilty of contributory negligence and recklessness as a matter of law. But the circumstances in that case present an entirely different situation from those under consideration. There the driver was thoroughly familiar with the crossing; there were no abnormal weather conditions affecting visibility; and the train blocking the crossing could easily have been seen in the exercise of the slightest degree of care.

The remaining question relates to the amount of the verdict. Respondent, a young man 27 years of age, was knocked unconscious and so remained until the following day. His throat was cut, his left eye injured, his right shoulder sprained, and he sustained a fracture which was described by one of the physicians as "a degree of

broken neck." He was in the hospital for about one month and was in a body and head cast for about three months. The cast was built up from the lower part of his stomach and extended under the chin and over the head, leaving only his face free of the cast. He was unable to work for a period of seven months. At the time of the trial, more than three years after the injury, he continued to suffer intermittent pain in the neck. While the wounds and fractures have healed, there is left a scar on his neck; there will always be a slight limitation of neck motion; and the vision in his left eye is impaired.

The property damage, hospital bills and lost time amounted to approximately $1,000.00, leaving approximately $4,000.00 of the verdict as compensation for pain and suffering and permanent injury. We do not feel warranted in holding that the refusal of the trial Judge to disturb the verdict amounted to a manifest abuse of the discretionary power vested in him. *Smith v. Southern Railway*, S. C., 35 S. E. (2d), 225.

All exceptions are overruled and judgment affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES and TAYLOR concur.