16143

## GORDON v. ROTHBERG *ET AL.*

(50 S. E. (2d) 202)

494

*Messrs. Schultz & Mills,* of Columbia, *for Appellant,*

*Messrs. Baker & Baker and F. Erhlich Thomson,* of Columbia, *for Respondent,*

November 9, 1948.

BAKER, Chief Justice.

This is an action in tort in which the respondent recovered a judgment against the appellants for both actual and punitive damages, the cause of action being bottomed on an alleged illegal, willful, wanton and malicious trespass by the appellants upon real property in the sole possession and control of the respondent.

Although the pleadings, that is, the complaint of the respondent, the answer and counterclaims of the appellants, a reply by the respondent, and a demurrer to the counterclaims are set out in full in the record, no issue is raised on this appeal as to the disposition made of the counterclaims of the appellants, the reply of the respondent, or the demurrer. Indeed, it is unnecessary that we herein set forth even a summary of the complaint and the answer, the tenor of which can be gathered respectively from the opening statement in this opinion, and from appellants' statement of "Questions Involved," No. 2.

The appellants state the "Questions Involved" to be:

"1. Should a mistrial have been granted by the Trial Judge because of prejudicial remarks of counsel for Respondent?

"2. Should the Trial Judge have submitted the question of Appellant's plea of joint venture to the jury?

"3. Should the recovery of actual damages have been ordered or be allowed to stand?

"4. Should the Trial Judge have submitted the question of punitive damages to the jury and should the recovery be allowed to stand?

"5. Should a new trial be ordered because of remarks of the Trial Judge which were prejudicial to Appellants?"

Before attempting to enter upon a discussion of these questions, it is proper to state that the basic facts of this case are, for all practical purposes, undisputed; and stated briefly, show:

The respondent was the owner of a business located about two miles outside the city limits of Columbia, engaged in the manufacturing of metal chairs. The appellants, Hyman Rothberg, Michael Rothberg and Hank M. Rothberg, a copartnership doing business under the name and style of Rothberg Manufacturing Co., had a place of business on the same lot or near to respondent's business, where they manufactured the seats and backs for respondent's chairs, and which were sold to the respondent on a time basis. There was also another partnership, consisting of the three Rothbergs above named, their father, who died prior to the commencement of this action, and a Mr. Tomlinson, doing business under the firm name and style of Merchandise Mart. This last named partnership had the exclusive right under a contract with respondent to dispose of the output of his chair factory at a 20% discount, or commission to them based on the current market price of the chairs at the time of purchase or sale. The property on which all of these businesses were conducted, was owned by M. B. Kahn and by him leased to appellants, who subleased it to Merchandise Mart, the appellants and Merchandise Mart, under an agreement between themselves, absorbing the $600.00 monthly rental in equal amounts. When the respondent established his business for the manufacture of chairs, he subleased from Merchandise Mart, a shed, its dimensions being sixty feet by one hundred feet, located on this Kahn property at a yearly rental of $1.00, and further agreeing to grant Merchandise

Mart the exclusive sales rights to the merchandise to be manufactured by him. The respondent then converted the shed to his purpose at his own costs, moved his machinery therein, and entered upon the business of manufacturing metal chairs, using as the backs and seats for his chairs, the products intended for this purpose and which was manufactured by appellants, and purchased by him from appellants. The respondent commenced the manufacture of chairs about March 15, 1946, and remained in business for approximately nine months and to the time when he was informed by Merchandise Mart, through Hyman Rothberg, that they would not accept any more chairs after December 1st, and having no sales organization of his own, and being unable to find a market for his manufactured product, although he had undertaken to do so, and having all of his capital tied up in this manufacturing enterprise in machinery, in merchandise on hand and in material which had not been processed, he was forced to close the business. During the time respondent was operating this chair factory, the appellants advanced him money from time to time, with which to meet his pay roll, and for other purposes of the business, and waited for the repayment of these advances until he could collect from Merchandise Mart for chairs sold to them or by them. However, at the time the respondent was forced by conditions to discontinue his business, he was indebted to the appellants in the sum of $684.23, and to Merchandise Mart in the sum of $121.95.

Following the closing of the business, the appellants gave employment to the respondent at a weekly wage. The respondent first tried to sell his entire business, but in this he was not successful. He then tried to sell as much of the equipment as he could. He finally located a customer who was interested in buying his tube bending machine, the most expensive piece of machinery or apparatus in the building, and a machine which was scarce on the market. After the respondent had closed his chair factory and at some time prior to when he met this prospective purchaser at his place

of business so that he could inspect the tube bending machine, there had been a discussion between respondent and appellants concerning the indebtedness of the former to the latter, and during this discussion the respondent had stated that he would not be able to pay this indebtedness as it was his duty to refund money he had borrowed from relatives and which had been used in purchasing machinery for the chair factory, and there would not be sufficient from the sale of all assets to pay all of even the borrowed money, and that he did not intend to pay the amount owed the appellants. The respondent had padlocks on the doors to his chair factory, and was the only person in possession of the keys thereto. Without molesting the respondent's padlocks, the appellants placed additional padlocks on all of the doors, which came to the knowledge or notice of the respondent for the first time when he met the prospective purchaser, who was from North Carolina, at the closed factory. So far as the record discloses, there had been no machinery or stock removed from the factory from the date when operations ceased.

On the night of April 15, 1947, by appointment made over the telephone, the prospective purchaser having come to Columbia to inspect the tube bending machine in respondent's factory, met the respondent at his factory. The respondent was unable to gain entrance to the building through any of the doors by reason of the locks which had been placed thereon by appellants. The respondent noticed a light on over at the building occupied by Rothberg Manufacturing Co. and went over there, which was only a short distance. Soon thereafter, "Hy" Rothberg, one of the appellants, arrived at the place of business of the appellants, and admitted having placed the additional locks on the building or factory of the respondent. The testimony is in considerable conflict as to what took place between the parties to this action at that time (and also the next morning), but one door was finally opened by forcing the stronger lock, the appellants being unable to find the key thereto that night, and the ma-

chine in which respondent's customer was interested was inspected, but under circumstances embarrassing to the respondent, the said "Hy" Rothberg (we assume Hyman Rothberg) with some of his employees accompanying the respondent and his customer into the building, and remaining throughout the inspection. As a result of this inspection, and an additional inspection the following morning, a sale of the tube bending machine was effected. There was some delay in gaining entrance to the building that morning, but the keys to the locks which had been placed on the doors by the appellants were produced by them, and the doors opened. Prior to the machine being moved from the building or factory, appellants were paid the full amount of the indebtedness of the respondent to them, and also his indebtedness to Merchandise Mart, and respondent was then permitted to remove the machine.

The admitted fact is that the appellants, without consulting an attorney, placed these locks on this building which was in the sole possession and control of the respondent with the intent of thus enforcing the collection of the respondent's indebtedness to them, and to Merchandise Mart, in which they had an interest.

Having set forth the foregoing pertinent testimony in the case, we will now proceed to discuss the "Questions Involved" as stated by the appellants.

During the trial of the case, and while one of the appellants, Michael M. Rothberg, was being cross examined by counsel for respondent in reference to his wealth, and the financial worth of the businesses or partnerships in which he was interested, this witness had testified that Rothberg Manufacturing Co. was on the verge of bankruptcy, and insolvent. We now quote from the record:

"Q. How long have you been connected with Rothberg Manufacturing Company? A. Since its inception—about five or six years.

"Q. Rothberg Manufacturing Company was in business during the War, was it not? A. That's correct.

"Q. What did you manufacture during the War, sir? A. Smoke-bomb boxes and ammunition cases.

"Q. Smoke-bomb boxes and ammunition cases? A. Yes, sir.

"Mr. Schultz: If your Honor pleases, I don't understand this now. He is going back to the manufacturing business prior to this time?

"The Court: He is trying to show how much the defendants are worth.

"Mr. Baker, L. J:: Sure. This corporation could be bankrupt today, and this man could have made a million dollars during the War, and still have, and has it.

"Mr. Schultz: Counsel is testifying now. He had no right to say that.

"The Court: No, sir, I think you went a little too far there.

"Mr. Schultz: I believe that should be taken away from the jury, and they should be instructed not to pay any attention to that.

"The Court: Of course, I will instruct them to disregard the statement that he did make money during the War.

"Mr. Schultz: He said he has it now.

"Mr. Baker, L. J.: I said he may have it. I don't know, as a fact, that he made money during the War.

"The Court: I will instruct the jury to disregard anything Counsel said about what he may have made out of the Rothberg Manufacturing Company during the War. Disregard it entirely, Gentlemen. However, I do think he can question him along that line, to establish whether or not they made any big money during the War.

"Mr. Schultz: We believe that has prejudiced our case, your Honor.

"The Court: Oh, I don't think so. What did he say exactly, Mr. Stenographer?

"The Stenographer: 'Mr. Baker: Sure. This corporation could be bankrupt today, and this man could have made a million dollars during the War, and still have it, and has it.'

"Mr. Schultz: Your Honor, I believe, in the interests of my clients, I would have to ask for a mistrial.

"The Court: Well, I will have to refuse the motion, and instruct the jury that Counsel has not been out of Law School too long, and hasn't had the experience that some other practitioners have, and he may have become a little overzealous, but his statement wasn't made as a witness under oath, and you cannot consider anything in this case except the sworn testimony given from the witness stand, and I, therefore, instruct you to disregard the remark of Counsel as to what the corporation might have done, or what this man might have done, or what he might have today, or what he has today.

"Mr. Baker, L. J.: Your Honor, I apologize to the Court if I overstepped the bounds in the heat of argument."

Counsel for appellants very properly and correctly concede that under the general rule the granting of a motion for a mistrial by reason of anything occurring during the trial of a case is within the sound discretion of the trial Judge, and his ruling thereabout will not be disturbed unless there has been an abuse of this discretion. "Abuse of discretion" is a legal term to indicate that the appellate court is simply of the opinion that there was error of law in the circumstances. *Poole v. Saxon Mills et al.,* 192 S. C. 339, 350, 6 S. E. (2d) 761, 765.

We have set out above everything that was said by counsel and by the trial Judge in connection with the incident complained of, and while at one place the trial Judge did state, "I do think he can question him along that line, to establish whether or not they made any

big money during the War," yet following the reading by the official court stenographer of the statement which had been made by one of the counsel for the respondent, the trial Judge, in no uncertain terms, instructed the jury to disregard the remark of counsel, and counsel immediately apologized therefor in open court.

From a careful study of the record in reference to this occurrence in the trial, it does not appear that appellants at that time attached any importance to the statement of the trial Judge, of which complaint is now made, nor did they attach any importance thereto at the time a motion for a new trial was argued. We see no abuse of discretion in the refusal of the trial Judge to order a mistrial because of the unfortunate remark of respondent's counsel.

There is no claim on the part of the appellants that their connection with the respondent was that of partners in the business which he was conducting under the name and style of Gordon Manufacturing Company. But they say there was evidence from which a reasonable inference could be drawn that their relation with the business of the respondent constituted a joint adventure, and that if Gordon Manufacturing Company was a joint venture with the respondent as first party, and the appellants as second parties thereto, then an action for the alleged trespass would not be maintainable, and that hence this issue should have been submitted to the jury.

"On the whole, * * *, it must be said that the courts have not yet laid down any very certain or satisfactory definition of a joint adventure, nor have they established any very fixed or certain boundaries thereof, but in most cases, they have been content to determine merely whether the given or conceded facts in the particular case constituted the relationship of joint adventurers." 30 Amer. Jur., Par. 3, Joint Adventures, p. 678.

In *Welling et al. v. Crosland et al.*, 129 S. C. 127, 141, 123 S. E. 776, 781, it is stated: "Practically the only difference between a 'joint adventure' and a 'partnership' is that a partnership is ordinarily for the transaction of a general business of a particular kind, while a joint adventure relates to a single transaction. A joint adventure was unknown to the common law, being regarded as within the principles governing partnerships; it is still governed by the same rules of law. 23 Cyc. 453."

Probably one of the most concise statements as to what constitutes a joint adventure is in *Dexter & Carpenter v. Houston*, 4 Cir., 20 F. (2d) 647, 651, and reads: "A special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation."

Without undertaking to here set out all of the general requirements necessary to create the status of a Joint Adventure, we think that one very necessary requirement is lacking in this case, to wit, there was no joint proprietary interest and right of mutual control over the subject of the enterprise or over the property engaged therein. The appellants had no voice or right to be heard in the control or management of the enterprise.

Furthermore, while it may not always be necessary that all of the parties to the joint adventure share in the losses of the enterprise, in the instant case, the appellants shared in neither the profits nor the losses (and there was a loss), and made no contribution to capital invested therein.

When but one reasonable inference can be deduced from the evidence, the question becomes one of law for the Court (*Bell v. Bank of Abbeville*, 211 S. C. 167, 44 S. E. (2d) 328), and we are of opinion that under the evidence, the trial Judge properly refused to submit to the jury the question of appellants' plea of joint adventure.

It would appear that there was at most nothing more than a contractual arrangement between the parties to this action.

Where, as in this case, the legal rights of the respondent have been invaded, the law presumes that he suffered some actual damages, and it was therefore not improper for the trial judge to direct a verdict for such form of damages against the appellants, leaving the amount thereof to be determined by the jury. The jury found that the respondent had suffered actual damages in the sum of $500.00. Upon motion for a new trial, the amount thereof was reduced to $300.00 in an order granting a new trial, *Nisi*. Under the evidence in this case, we cannot say this amount is excessive.

This case comes within the class of cases where a verdict for punitive damages alone, without a finding of actual damages, could be sustained. *Vlasservitch v. Augusta & A. R. Co.*, 85 S. C. 291, 67 S. E. 306. In this connection, see *Cook v. Atlantic Coast Line R. Co.*, 183 S. C. 279, 190 S. E. 923. The evidence in this case fully warranted the submission of the issue of punitive damages to the jury. A reasonable inference could be drawn from the testimony that there was a reckless, willful and conscious invasion of the rights of the respondent by the appellants, and for the sole purpose of collecting his indebtedness to them and to another partnership in which they were interested. At no time prior to placing padlocks on the doors of respondent's place of business had they ever asserted or attempted to assert any relationship to the business other than that of creditor and debtor. In fact, a reasonable inference was that the first time the relationship of joint adventure ever entered into even mental existence was apparently after the commencement of this action.

The jury awarded the sum of $6,500.00 as punitive damages, which amount was reduced by the trial Judge to $6,000.00 in his order granting a new trial

*Nisi.* While the amount of punitive damages appears to be excessive, yet the Circuit Judge having heard all of the testimony as it came from the mouths of the witnesses, and having observed the demeanor of the witnesses on the witness stand, has put his stamp of approval on the verdict to the extent above stated.

This Court will not usually interfere in the amounts of verdicts, the matter being one ordinarily within the sound discretion of the Circuit Court, unless the verdict is so grossly excessive as to be deemed the result of a disregard of the facts, and of the instructions of the Court, and to be due to passion and prejudice rather than reason. "Where this is found to be the case, it is the verdict itself, rather than merely the amount of the verdict, which is inherently vicious, and the verdict should not be permitted to stand whether the question arises in the Circuit Court or in this Court." *Bowers v. Charleston & W. C. Ry. Co.,* 210 S. C. 367, 42 S. E. (2d) 705, 708. We do not feel impelled to interfere with the verdict as reduced by the trial Judge.

The issues undertaken to be raised by appellants' Exceptions 9 and 10 (Question 5) are too general to be considered, and violate Section 6 of Rule 4 of this Court. Moreover, the matters complained of were not included in the appellants' grounds on motion for new trial made before the trial Judge, and he has not been given an opportunity of passing on same.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

Fishburne, Stukes, Taylor and Oxner, JJ., concur.