17503

Hester PEAGLER, Respondent, v. ATLANTIC COAST LINE RAIL-
ROAD COMPANY, and Kenneth Norton, Jr., and Murray M.
NORRIS, Appellants

(107 S. E. (2d) 15)

See also 232 S. C. 274, 101 S. E. (2d) 821.

*Messrs. Hagood, Rivers & Young,* of Charleston, *for Ap-pellants,*

142

*Messrs. Meyer, Goldberg, Hollings, Lempesis & Uricchio,* of Charleston, *for Respondent,*

February 12, 1959.

Moss, Justice.

The respondent, Hester Peagler, brought this action against the Atlantic Coast Line Railroad Company, and

Kenneth Norton, Jr. and Murray M. Norris, the conductor and engineer respectively, appellants, for personal injuries received at about 6:00 o'clock p. m. on November 19, 1955, when a Chevrolet automobile driven by him collided with the side of an empty black pulpwood flatcar that was standing on and blocking a railroad crossing over O'Hear Avenue in North Charleston, South Carolina.

The respondent alleged that his personal injuries were proximately caused and occasioned by the negligence, carelessness, recklessness and willfulness on the part of the appellants by stopping a low black empty pulpwood flatcar, in the darkness of night, across a twenty foot wide heavily traveled black surfaced public highway, thereby creating a deceptive condition and completely blocking the highway, and failing to provide warnings of the presence of said flatcar across the highway by notice, sign, signal, light, flagman or watchman. It was further alleged that in placing the empty flatcar across the said highway, by reason of its height, the impression was created that the said crossing was open and not blocked, and after creating such an unusual and extra hazardous situation or condition, appellants failed to use such precautionary measures as were necessary and proper in the circumstances to prevent injury to the traveling public.

The appellants denied the material allegations of the complaint and further set up a plea of contributory negligence, recklessness and willfulness on the part of the respondent, and alleged that the respondent, who was familiar with the crossing, ran into the side of the pulpwood car and failed to heed the highway railroad crossing signs, and railroad cross buck sign, and the speed limit on the highway, without looking or listening, or taking any precautions for his own safety, and alleged that he drove his automobile at a high, dangerous, reckless and unlawful speed into the side of the pulpwood car.

The case was tried before the Honorable T. B. Greneker, Presiding Judge, and a jury, at the March 1958 term of the

Court of Common Pleas for Charleston County, South Carolina. Appellants' timely motions for nonsuit and direction of a verdict were overruled, and the case was submitted to the jury, who found for the respondent $56,000.00 actual damages. Thereafter, the appellants' motion for judgment *non obstante veredicto* or for a new trial was denied; and the appellants now appeal on numerous exceptions, to which we shall later refer.

The first group of exceptions raises two questions: (1) Was the negligence of the respondent the sole proximate cause of his injuries? and (2) Was the respondent guilty of contributory negligence that will bar him from recovery? We consider these two questions together. These questions were raised in the lower Court by timely motions for nonsuit, directed verdict, judgment *non obstante veredicto* and for a new trial.

It is a well established rule of law that in passing upon the appellants' motions below, it is incumbent upon this Court to review the testimony, construing it in the light most favorable to the respondent. *Barnett v. Charleston & Western Carolina Ry. Co.,* 230 S. C. 525, 96 S. E. (2d) 555, and *Brown v. Powell,* 198 S. C. 403, 18 S. E. (2d) 212. It has also been held that if the only reasonable inference to be drawn from all the testimony is that the negligence of the complainant is a direct and proximate cause of his injury and damage, or that the negligence of the complainant contributed as a direct and proximate cause, then it would be the duty of the trial Judge to order a nonsuit or direct a verdict against such plaintiff. *Sewell v. Hyler,* 229 S. C. 480, 93 S. E. (2d) 637.

In the case of *Field v. Gregory,* 230 S. C. 39, 94 S. E. (2d) 15, we quoted with approval from the case of *Harrison v. Atlantic Coast Line R. Co.,* 196 S. C. 259, 13 S. E. (2d) 137, 141, the following:

"It is firmly established in this jurisdiction that if the inferences properly deductible from the evidence are doubtful,

or if they tend to show both parties guilty of negligence or wilfulness, and there may be a fair difference of opinion as. to whose act produced the injury complained of as a direct and proximate cause, then the question must be submitted to the jury. *Ford v. Atlantic Coast Line Railroad Co.,* 169 S. C. 41, 168 S. E. 143."

The evidence shows that O'Hear Avenue runs North and South. The railroad tracks run East and West. The pavement on O'Hear Avenue was twenty feet wide and the road was straight and level for a distance of about 1,200 feet south of the crossing. The road was straight and level north of the crossing for a considerable distance. There are no railroad or street lights directly at the crossing. There was a street light approximately 100 feet south of the railroad track and on the west side of O'Hear Avenue. There is testimony that this light does not have any effect on the crossing. The testimony shows that the crossing had no flash or blinker lights to warn the traveling public, and there were no flares. or fusees put out to warn the traveling public of the blocked crossing, nor was any flagman present to warn persons approaching the crossing of the presence of the train standing motionless on the track. There was nothing at the crossing to warn the public of the presence of the empty pulpwood car, except the car itself. The train, of which the pulpwood car was a part, consisted of an engine and fifty two cars, which was being operated over a service or spur track across O'Hear Avenue in a westerly direction to deliver and pick up freight cars. The train was stopped when it approached the main line of the Seaboard Railroad. The empty pulpwood car, the twenty-sixth car of the train, was stopped entirely across O'Hear Avenue, with each end of the flatcar clear of the paved highway. The stationary, empty, black pulpwood flatcar was 42 feet 8 inches long, and as is heretofore stated, was parked entirely across O'Hear Avenue, a twenty foot wide paved black top road, which said road was a well traveled public highway, leading from the Charleston Navy Yard section towards North Charleston. The pictures.

and diagrams of the pulpwood car show that the distance from the floor of the car to the ground is 48 3/16 inches and the distance from the floor of the car on the side thereof to the bottom of the sill at the center of the car is 36 5/8 inches. The car is made of 3/8 inch boiler steel, with a steel superstructure. The center sill is of solid steel and extends down from the floor of the car approximately three feet. The testimony shows that no one could see through this solid steel that is under the center of the car.

It is clear from the plat in evidence that O'Hear Avenue, south of the railroad crossing, is straight and level for a distance of approximately 1,200 feet, and for this same approximate distance beyond and north of the railroad crossing. There is testimony that shows that the respondent approached the railroad crossing in question from the south and that he was operating his automobile at a speed of 30 to 35 miles per hour. He saw the speed limit highway sign while approaching the crossing. The head lights on his car were working and were on dim on account of an approaching car from the north. The respondent was driving on the right side of the highway in the direction in which he was traveling and he could see evidently over the parked flatcar, the headlights of other cars which were beyond the crossing and approaching the same from the north. The respondent testified that his brakes were perfect and his lights were good, and that as he approached the railroad crossing, he saw a car approaching from the north towards him forty or fifty feet away, and that he was ten or fifteen feet from the crossing when he saw a black line, apparently an outline of the bed of the flatcar. He testified he saw a highway speed sign limiting travel to 35 miles per hour. Immediately after the respondent saw the black line above referred to he crashed into the flatcar and was unconscious until he "woke up in the hospital." There was also testimony that as the respondent drove his automobile towards the crossing, that a car approaching from the opposite direction blinked its lights and that the respondent remarked "What's he keep blinking his lights for, I got mine dim now."

There was testimony given in behalf of the respondent by witnesses who were driving automobiles from the north towards the crossing in question. One of these witnesses testified that as he approached the railroad crossing he saw the train slowly moving across the highway towards the west, and that he stopped a couple of minutes before the train did. He testified that there were no lights at the crossing, that he saw the respondent's car coming from the south and when the respondent approached the crossing he blinked his lights as a warning because the train was then standing across the road in the darkness, and had been for two or three minutes. This witness testified that he blinked his lights in an effort to warn the respondent of the presence of the train, because he observed that the respondent kept going after he reached the point where he should have been putting on brakes and stopping. Another witness testified that he was traveling south on O'Hear Avenue and that he was meeting another car coming from the south, that he dimmed his lights and about that time he saw the lights of the respondent's car go out and heard a noise. He testified also that prior to the actual crash he had not seen a train. He also said that nothing appeared to be blocking the crossing because he could see the lights of the car approaching from the south. The witness testified that after the collision of the respondent with the empty flatcar, that the train moved towards the west and was dragging the car of the respondent with it. Other witnesses corroborated the testimony above recited.

The testimony shows that this train had a crew of five men. The engineer, the fireman and a switchman were in the cab of the engine, while the conductor and the other switchman were in the caboose. No one was on the train between the engine and the caboose. It was admitted that the crossing had no flashing or blinking lights, and there were no gates at the crossing. The crossing was not flagged nor was any one left by the appellants at this public crossing to warn the traveling public about the presence of the flatcar across O'Hear Avenue. It was also admitted that there were no

flares or fusees at the crossing. The first that the train crew knew of the collision was when the caboose of the train passed over O'Hear Avenue and the conductor and the switchman heard shouts and went to the rear platform of the cab, and the conductor saw a group of people at the crossing.

There is evidence which shows that the respondent saw the lights of automobiles approaching him from the north and that the street lights north of the crossing were visible to a traveler coming from the south. The testimony also reveals that travelers from the north could see the lights of automobiles approaching from the south.

Appellants assert that the design and measurements of the flatcar involved in the collision, including the fact that it had white letters and figures upon it, were such that it would be impossible for the respondent not to have seen said flatcar silhouetted by lights of a car coming from the north. They assert that the blinking of the lights of the car coming from the north must, of necessity, have silhouetted the pulpwood car and made it visible to any one who was looking. They also say that the head lights on the car driven by the respondent must have shone on the pulpwood car and disclosed its presence on the crossing in ample time for the respondent to have stopped his car, particularly in view of the fact that the respondent knew of the presence of the crossing. It is in the testimony that the witnesses coming from the north did not see the flatcar upon the crossing and one of the witnesses saw it only when he was "very close" upon it. It is reasonable to suppose that the travelers from the north would have had the same opportunity to see the flatcar because the lights of the respondent approaching from the south would have also silhouetted the flatcar on the crossing, but there is evidence that the travelers from the north did not see the flatcar.

There is evidence in the record from which the jury could have concluded that the appellants had allowed its train to

remain motionless and unlighted at the crossing for over two minutes prior to the collision. The pulpwood flatcar, which was stopped across O'Hear Avenue in the dark, was black, which was also the color of the highway, and the length of the car in its position on the track was such that it completely spanned the highway. The train was long and there is no evidence that the lights from the locomotive or the caboose at either ends of the train were visible at the crossing. The night was dark and a growth of trees existed around the crossing. The empty flatcar involved, which occupied the crossing, was not sufficient in height to cut off the lights of automobiles approaching on the opposite side of the crossing. It is reasonably inferable from all the testimony that a reasonably prudent person, even if he knew of the existence of the crossing, would have concluded from the absence of the train lights, the absence of any precautionary warnings at the crossing, and from his ability to see the street light north of the crossing, and of automobile lights approaching from the north side of the crossing, and misled by the stillness and blackness of the empty flatcar obstructing the highway, which blended with the black surface of the highway, that the crossing was clear and unobstructed and that no train was using the track. It is reasonably inferable from the evidence that the diversion of respondent's attention by the shifting head lights of an oncoming car added to the obscurity of conditions existing at the crossing at the time so as to produce a deceptive and delusive condition. It is reasonably inferable from the testimony that an unusual and extra hazardous situation was created at the crossing. It is likewise inferable from the testimony that because of the unusual and extra hazardous condition at the crossing, the same having been created by the appellants, that they should have taken whatever precautionary measures due care dictated to warn the traveling public of the presence of the unlighted flatcar spanning the highway.

The case of *Bingham v. Powell,* 195 S. C. 238, 11 S. E. (2d) 275, 277, was an action for damages for personal in-

juries resulting from a collision of the plaintiff's automobile with the second freight car from the locomotive while the train was at rest, the crossing being completely obstructed by the stationary train. The plaintiff asserted that the railway company had failed to provide warning of the presence of the train by any appropriate signal, light or watchman. The answer of the railway company set up a general denial and plea of contributory negligence and willfulness. Timely motions were made for a nonsuit and directed verdict on the ground that the evidence was conclusive that the plaintiff's negligent, reckless and unlawful conduct was the sole or contributory proximate cause of his injuries. The trial Judge submitted all issues to the jury, which resulted in a verdict for the plaintiff. The evidence in behalf of the plaintiff shows that it was after night fall and raining, and the plaintiff testified that his vision was obstructed by the lights of a parked automobile near the track facing him on his left, and that he saw the cars only when in a few feet of them. It also appeared that the crossing had been blocked for two or three minutes before the collision. The Court, in affirming the verdict and judgment for the plaintiff, quoted with approval from the case of *Robinson v. Atlantic Coast Line R. Co.,* 179 S. C. 493, 184 S. E. 96, the following:

"It is not possible to lay down any definite rule by which to determine whether the question of contributory negligence is to be found, under the evidence, as a conclusion of law, or should be submitted to the jury as a question of fact. The determination of the question must necessarily be controlled by the facts and circumstances of the particular case. The court will not decide it as one of law if the testimony be conflicting, or if the conclusion to be drawn therefrom is doubtful and uncertain. This we have decided time and again. For under such circumstances the question clearly falls within the province of the jury.

\* \* \*

"Ordinary prudence might require a particular crossing to be flagged at a certain time and not at others, on account of

the circumstances or extraordinary danger, and this has been held ordinarily a question for the jury. * * *"

And again from the case of *Bingham v. Powell*:

"In this case the testimony shows that plaintiff knew the crossing, the approximate location of the track, and that he was approaching it, but none of such would charge him, in our view, with foresight of the complete blocking of the crossing by unlighted and unguarded freight cars despite the darkness and rain, and we think and hold that the circumstances herein pointed out require the conclusion that the issues involved in the appeal were properly submitted to the jury.

"There are many precedents in the decisions of this court for the view we take but it would needlessly prolong this opinion to review them. See *Myers v. Atlantic Coast Line R. Co.*, 172 S. C. 236, 173 S. E. 812; *Spiers v. Atlantic C[oast] L[ine] R. Co.*, 174 S. C. 508, 178 S. E. 136; *Kneece v. Southern Ry. Co.*, 187 S. C. 195, 197 S. E. 673, and the numerous earlier cases therein cited.

"We are not unmindful of the principles long established by this court that it is 'always train time at a railroad crossing' and that one approaching must make use of his senses, to the best of his ability under the circumstances, to ascertain the presence or approach of a train and do so in time and place, so far as is reasonably within his control, to be effective; but a careful review of the evidence here in the light of the authorities last cited, convinces us that the court below and this court cannot decide the issues contained in appellants' exception without invading the province of the jury.

"It may be added that the situation portrayed by the evidence here presented might well be one of more danger to the traveler upon the highway than that of a train in movement over a grade crossing under the same conditions of poor visibility induced by darkness, rain and fog, for the highway traveler would in the case of a moving train be first

afforded the warning and protection of the statutory cross-
ing signals by whistle or bell, the illumination of the cross-
ing provided by the headlight of the locomotive and then
the movement of the engine and cars which would occasion
noise and also are much easier to discern by sight in dark-
ness than are unlighted, stationary cars. Whether the fail-
ure by the defendants to provide something in substitution
by way of light, flagman, watchman or other means for the
usual warnings of a moving train at this rural and unlighted
crossing was in the exercise of ordinary prudence, or in neg-
ligent or willful and reckless disregard of such standard,
were questions properly determinable by the jury, and like-
wise were the questions of whether the plaintiff was guilty
of contributory negligence or recklessness and willfullness,
under proper instructions of the trial judge; and in this
appeal there is no complaint of the latter's instructions."

The case of *Crapse v. Southern Railway Company*, 201
S. C. 176, 21 S. E. (2d) 737, 740, was an action for dam-
ages for personal injuries sustained when the automobile
in which plaintiff was riding was ditched to avoid a colli-
sion with a train of the defendant. The lower Court granted
a nonsuit and the case was before this Court alleging error
in such order. The complaint alleged, and there was testi-
mony to show that a state highway was blocked by a train
of the defendant in such a manner that lights on automobiles
approaching from the opposite direction were visible through
the railway car, creating a dangerous condition by decreas-
ing the visibility of the blocked crossing, and that the plain-
tiff and driver of the automobile could not see the condi-
tion until within a few feet thereof, whereupon, the auto-
mobile was turned sharply to avoid a collision and over-
turned, whereby injuries were received. It appears that as
the operator of the colliding automobile approached the
crossing he saw a light about four or five hundred feet away,
which he judged to be the head lights of an approaching au-
tomobile; and that he accordingly dimmed his lights so that
he would not blind the other motorist, and did not see the

obstruction on the crossing until eighty or ninety feet away, when he turned on his bright lights and saw a black unlighted railroad car, over or under which he had seen the lights of the other automobile, and that the operator of the automobile coming from the opposite direction, a deputy sheriff, testified that as he approached the crossing he was within forty feet of the train before he saw it, that he applied his brakes and that he avoided a collision only by turning to his right. This Court, in reversing the order of nonsuit, said:

"As has been stated, the learned trial Judge held in his order of nonsuit that Coxwell, the driver, was guilty of gross negligence and the exceptions challenge this ruling. In our view more than one reasonable inference thereabout might arise from the testimony, on which account we find error. The fact that the automobile was operated at a speed of from forty to fifty miles an hour until the obstruction of the highway was recognized by the driver, when he thought it too late to stop his vehicle in time to avoid a collision and thereupon (and indicating at least some degree of care) turned and ditched it, is important. But it should be weighed by the jury with the other facts in evidence and especially in the light of his testimony to the effect that he observed the headlight of an automobile approaching from the opposite direction of the other side of the railroad crossing, whereby he thought the latter unobstructed. Whether his conduct in this connection was negligent or grossly so was, in our opinion, for the jury, under suitable instructions, and not for the decision of the Court. This is another example of the application of the adage that 'the facts make the law.' "

In the case of *Lawrence v. Southern Railway, Carolina Division,* 169 S. C. 1, 167 S. E. 839, an action was brought for damages to person and property growing out of a collision between an automobile of the plaintiff and a standing train of the defendant at a crossing. It appears that the Railroad Company had blocked and obstructed a crossing at a public street in the City of Charleston; that in the train, and

standing immediately upon the crossing, was a car whose doors were open, so that the street lights thereabout showed through the open windows, creating a deceptive and dangerous situation for travelers upon the highway, and decreasing the visibility of the blocking of the crossing; and that, while driving his automobile south on King Street, a much traveled thoroughfare, the plaintiff collided with the standing car on the crossing. A verdict was had for the plaintiff, and upon appeal to this Court, the exceptions challenged the ruling of the trial Judge for his failure to grant a nonsuit or directed verdict upon the ground that plaintiff's injuries were brought about by his sole and contributory negligence. Even though the Court held that there was no proper plea of contributory negligence, that under the conflicting testimony the issues raised were properly submitted to the jury for its determination.

In the case of *Kneece v. Southern Railway Company*, 187 S. C. 195, 197 S. E. 673, an action was brought for the wrongful death of the plaintiff when his automobile, in which he was riding alone, ran into a freight train of the defendant at a highway crossing in the town of Monetta in Aiken County, South Carolina. It was asserted in behalf of the plaintiff that the train was stopped over and upon a crossing completely obstructing the highway and that the Railway Company failed to use any precautionary measures as were necessary and proper in the circumstances to give warning to travelers upon the said highway of the presence of the blocking of said crossing by the freight train in the nighttime. As an answer, the Railway Company interposed a general denial and pleas of contributory negligence and willfulness on the part of the intestate. The Railroad Company made timely motions for a directed verdict on the ground that there was no proof of any actionable negligence on its part and that the only reasonable inference to be drawn from all the testimony was that the intestate was guilty of contributory negligence, recklessness and wantonness. There was a factual dispute as to whether the train was standing

or moving at the time of the collision. There was evidence tending to show that the freight car with which the intestate collided had a clearance from the top of the rail to the bottom of the car sill of 33 inches and that one approaching on the highway, because of the upgrade, would look under the box-car on the crossing to the sky beyond and for that reason such car would not be seen until the approach thereto was close. There was also testimony to the effect that trees on each side of the highway cast shadows and formed a dark background, making it difficult to see a freight train standing on the crossing. This Court held that more than one reasonable inference could be drawn from the testimony as to the contributory negligence of the deceased, which required the submission of the question to the jury.

In 161 A. L. R., at page 118, it is said:

"Sometimes lights on an automobile coming from the opposite direction, and city lights or physical objects beyond the crossing, can be seen notwithstanding the fact that the crossing is obstructed, and this is particularly true where there is a flatcar or logging car on the crossing which presents only a very narrow obstruction to the view of things beyond the crossing. Under such circumstances several courts have held that the jury should be permitted to find that the circumstances presented an illusion of safety at the crossing creating an unusual hazard to the operator of a motor vehicle approaching the crossing; * * *"

There is cited in support of this text the South Carolina cases of *Kneece v. Southern Railway Company and Crapse v. Southern Railway Company, supra.* It is also supported by the cases of *Beaumont S. L. & W. R. Co. v. Richmond,* Tex. Civ. App., 78 S. W. (2d) 232; *Beaumont S. L. & W. R. Co. v. Cluck,* Tex. Civ. App. 95 S. W. (2d) 1033; *Gulf, C. & S. F. R. Co. v. Picard,* Tex. Civ. App., 147 S. W. (2d) 303; *Godwin v. Camp Mfg. Co.,* 183 Va. 528, 32 S. E. (2d) 674.

In the case of *Beaumont S. L. & W. R. Co. v. Richmond, supra,* a judgment for the plaintiff was affirmed, where it

appeared that a train had stopped so that a flatcar was on the crossing; that plaintiff was driving toward a town which was just beyond the crossing; that the night was dark and hazy with a little rain; that as the plaintiff approached the town, a switch light and the crossing sign on the other side of the tracks were visible; that the lights of the town could be seen over the top of the flatcar; that the lights of the automobile tended to shine under the car and along the highway beyond; that there was no flagman or any special signal to warn of the presence of the train on the crossing; and that in spite of the hazy conditions, the plaintiff saw the crossing in time to stop if he could have seen the flatcar obstructing the crossing, but the circumstances created an illusion that the crossing was not occupied.

In the case of *Southern Ry. Co. v. Toney,* 4 Cir., 156 F. (2d) 261, a judgment for the plaintiff was affirmed, where it appeared that his car collided with a tank car, which was a part of the defendant's train, and was standing and blocking a highway on which he was driving. The plaintiff testified that he was thoroughly familiar with the crossing and that his speed at the time of the collision was not over thirty miles an hour, that he looked to the right and left before driving on the tracks and that his dimmed light shone over the oil car blocking the highway without revealing the presence of the car, and showed clear on the road "beyond the tracks on the other side." The defendant challenged the testimony of the plaintiff that the lights shone clear on the other side of the highway beyond the tracks without revealing the presence of the oil car on the ground of physical impossibility, since the space between the ground and bottom of the car on the crossing could not have been greater than 19 to 28 inches. The defendant, by proper exceptions, raised the question of whether the plaintiff was guilty of contributory negligence as a matter of law. The Circuit Court of Appeals for the Fourth Circuit held that under the factual showing it was for the jury to say whether the plaintiff was guilty of contributory negligence.

We call attention to the following cases in which there was a collision between an automobile and a train standing across a highway. *Prescott v. Hines,* 114 S. C. 262, 103 S. E. 543; *Miller v. Atlantic Coast Line R. Co.,* 140 S. C. 123, 138 S. E. 675; *Myers v. Atlantic Coast Line R. Co.,* 172 S. C. 236, 173 S. E. 812; *Spiers v. Atlantic Coast Line R. Co.,* 174 S. C. 508, 178 S. E. 136; *Bober v. Southern R. Co.,* 151 S. C. 459, 149 S. E. 257.

We conclude, under the factual showing made by the respondent, and under the cited authorities, that the trial Judge was correct in submitting to the jury the question of whether the injuries to the respondent were proximately caused by his sole negligence or by his contributory negligence.

The next question for consideration is whether the verdict in this case should be set aside as inherently vicious, grossly excessive, and the result of passion and prejudice.

In the case of *Gordon v. Rothberg,* 213 S. C. 492, 50 S. E. (2d) 202, 208, this Court said:

"This Court will not usually interfere in the amounts of verdicts, the matter being one ordinarily within the sound discretion of the Circuit Court, unless the verdict is so grossly excessive as to be deemed the result of a disregard of the facts, and of the instructions of the Court, and to be due to passion and prejudice rather than reason. 'Where this is found to be the case, it is the verdict itself, rather than merely the amount of the verdict, which is inherently vicious, and the verdict should not be permitted to stand whether the question arises in the Circuit Court or in this Court.' *Bowers v. Charleston & W. C. Ry. Co.,* 210 S. C. 367, 42 S. E. (2d) 705, 708. * * *"

In 15 Am. Jur., Damages, para. 205, at page 623, the following statement, employed by Chancellor Kent, has been frequently quoted or paraphrased in passing upon objections to verdicts as being excessive:

"The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess."

In the case of *Nelson v. Charleston & Western Carolina Ry. Co.*, 226 S. C. 516, 86 S. E. (2d) 56, 58, this Court said:

" * * * As was pointed out in *Bowers v. Charleston & W. C. Ry. Co.*, 210 S. C. 367, 42 S. E. (2d) 705, and again in *Vernon v. Atlantic Coast Line R. Co.*, 221 S. C. 376, 70 S. E. (2d) 862, this court will not undertake to set aside a verdict because its amount is such as to indicate merely undue liberality on the part of the jury. The power in such case to set it aside, or reduce it by granting a new trial *nisi*, rests with the trial judge alone. It is only when the verdict is so grossly excessive as to indicate that the jury was moved by passion or prejudice or other considerations not founded on the evidence and the instructions of the trial court, that it becomes the duty of this court, as well as of the trial court, to set it aside absolutely. * * *"

The respondent is a young man, 31 years old at the time of the accident, with a statutory life expectancy of 36.88 years. The testimony shows that the injuries which respondent suffered required his hospitalization from November 19, 1955 to February 18, 1956, during much of which time he suffered terrible pain and required sedation. The cost of his hospitalization, medical and dental bills, ambulance service, nursing service, and a leg brace, totalled $3,173.85. The medical testimony shows that the respondent is permanently injured because he has a two inch shortening in his left leg. He has developed arthritis in the knee that came as a result of being injured. He has varicose veins in his left leg, indicative of insufficient circulation. His

jaw bone was broken in a number of places and he had multiple fractures and injuries of his left leg. The thigh bone above and the bone below the knee were broken and telescoped in a number of places. The attending physician testified that the respondent was seriously and permanently disabled. The evidence shows that several of the respondent's teeth were knocked out and others were broken off at the gum, requiring their removal. It appears that the dental surgeon was unable to make fixed restorations and the teeth removed were replaced with removable dentures.

Under the foregoing facts, we cannot say that the trial Judge erred in not setting aside the verdict. We cannot reduce the verdict and can reverse for excessiveness only when the verdict is so out of proportion to the evidence that it clearly indicates that it was influenced by partiality, prejudice, passion, caprice, or other considerations not founded upon the evidence.

The trial Judge, in passing upon whether the verdict in this case was excessive, said:

"The Plaintiff removed his trousers during the course of the trial, and the Jurors and this Court had full opportunity to view the physical results of his injuries. In my opinion, the Plaintiff became severely maimed as a result of the collision in this case, and necessarily underwent a great deal of pain over a considerable period of time. His injuries are permanent."

The trial Judge also said in refusing the motion for a new trial that the verdict did not surprise or shock him, but if the jury had not rendered a verdict in favor of the respondent he would have been surprised, and he concludes his remarks by saying: "I don't think that if I were on the Jury I would have opposed the return of a verdict for actual damages in the amount determined by the Jury."

We agree with the trial Judge that in view of the injuries sustained by the respondent that it is not logical to conclude that the size of the verdict in this case was so excessive as

to indicate that the jury was moved by passion or prejudice or other considerations not founded on the evidence. We think the Court below was correct in refusing to grant a new trial absolute as asked for by the appellants. Therefore, the exception imputing error to the presiding Judge is overruled.

The next exception charges the Court with error in refusing to admit in evidence a certain photograph taken in the nighttime, during the course of the trial, of an experiment which was an alleged reenactment of the conditions existing at the crossing at the time of the collision of the respondent with the train. The purpose of the photograph was to show conditions of visibility and the appearance of objects at the crossing at the time of the accident. The appellants assert that the photograph speaks for itself and shows that any one sober and looking must have seen the well lighted pulpwood car in time to avoid the collision.

It appears that the experiment at the crossing in question was arranged by an employee of the railway company who had no personal knowledge of what had happened at the time of the collision. He testified that he had the pulpwood car in question placed over the crossing and that he placed a 1950 Chevrolet automobile, with its head lights on low beam, 100 feet south of the crossing, and in the right-hand lane of said highway, going north. He placed a 1951 Ford automobile, with head lights burning, on the north side of the crossing in the south-bound lane, headed south, and about a car length from the crossing. He also testified that at the time of the experiment the night was dark and clear. He testified that after he had placed the pulpwood car and the automobiles that he had a photograph made of the scene and that it was a correct representation of what the witness saw. It appears that on the night of the experiment that another pulpwood car was placed to the left of the flatcar in question. The following colloquy between the trial Judge and counsel for the appellants took place at the time the photograph was offered:

"The Court: Now, this car next to it, with all those lights on it, was that car next to it on the night of the collision?

"Mr. Rivers: I do not know whether it was or not.

"The Court: Well, I could not, under those conditions, admit it."

It was then asked of the witness who was performing the experiment:

"Q. What is this light that I show you in the left hand part of the picture? Is that a part of the train? A. No, sir.

"Q. What is that? A. That's a light coming from that house over there in front of the crossing.

"The Court: In order that I may not be misunderstood, I do not see how, under conditions, I could admit this entire line of light that shows on this car; there's no evidence that this light—that this is the same car that was next to 4131 on the night of the accident.

"Mr. Rivers: No, sir, we do not know.

"The Court: I could not, under those conditions, admit it."

The trial Judge, in his order refusing the motion for a new trial, gave his reasons for excluding the photograph. He said:

"* * * I examined the picture again carefully during the argument for the new trial, and I advised counsel for the Defendants that I desired it to be clearly set forth in the record that my reasons for excluding the picture was that it did not appear to clearly and substantially represent the conditions at the time of the injury to the Plaintiff, and the proper foundation had not been laid as to similarity of conditions, and that the lights in the rear in the upper section of the picture appeared more like a Christmas tree or the lighted windows of a passenger car, and counsel for Defendants admitted that there was no lighted passenger car present at the time of the injury. I knew of no facts in the evidence to support what the picture apparently portrayed, and in the exercise of my discretion, with the testimony of the witnesses

being fresh upon my mind, I considered that it would be prejudicial to admit the said picture; and therefore, I excluded the photograph or picture. There were other facts in the testimony, and lack of facts in the testimony, which led me to conclude that in the interest of justice, the photograph of this experiment should have been excluded, and I exercised my discretion after carefully considering the same."

In the case of *James v. Atlantic Coast Line R. Co.,* 199 S. C. 45, 18 S. E. (2d) 616, 619, this Court said:

"In the trial of cases on circuit a large measure of dicretion must be given to the Circuit Judge, both in the admission and exclusion of testimony, as well as many other matters connected with the trial, to the end that justice may be accomplished. He is present in the atmosphere of the trial and usually the best judge of what the justice of the particular situation requires. As recently said by Mr. Justice Stukes, in writing the opinion of the Court in *State v. Gregory,* 198 S. C. 98, 103, 16 S. E. (2d) 532, 534:

" 'At the outset we repeat the time-honored tenet that ordinarily the conduct of a trial, including the admission and rejection of proffered testimony, is largely within the sound discretion of the trial Judge and his exercise of such will not be disturbed by this Court on appeal unless it can be shown that there has been an abuse of discretion, a commission of legal error in its exercise, and that the rights of the appellant have been thereby prejudiced. * * *' "

The determination of the relevancy and materiality of a photograph must be left to the sound discretion of the trial Judge. It is proper to exclude from evidence photographs which are not substantially necessary to show material facts or conditions. *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587. This Court approved the admission into evidence of a picture taken two days after a railroad crossing accident showing grass and weeds in the roadbed on each side of the crossing. *Nelson v. Charleston & Western Carolina Ry. Co.,* 231 S. C. 351, 98 S. E. (2d)

798. Where a photograph reasonably reproduces a locus it is proper to admit such in evidence, provided it is necessary to show material facts or conditions. *Brown v. Southern R. Co.,* 111 S. C. 140, 96 S. E. 701.

In the case of *Cincinnati, New Orleans & Texas P. R. Co. v. Duvall,* 263 Ky. 387, 92 S. W. (2d) 363, it was held in an action for injuries sustained by a plaintiff while stepping from a station platform to the first step of a railroad car that a photograph of the premises showing an exact reproduction of the circumstances and scene of the accident was properly admitted as evidence. Likewise, in the case of *Favre v. Louisville & N. R. Co.,* 180 Miss. 843, 178 So. 327, it was held that the trial Court properly admitted a photograph taken by the railway company where there was almost a perfect reproduction of the scene of the accident. However, it has been held that photographs are inadmissible, when they are taken under conditions which differed from those in dispute. *Hampton v. Norfolk & W. R. Co.,* 120 N. C. 534, 27 S. E. 96, 35 L. R. A. 808.

We have carefully considered the record in this case and we conclude as did the trial Judge, that it was proper to exclude the proffered photograph for the reason that there were no facts in the evidence to support what the picture attempted to portray The conditions under which the photograph was taken differed from those in dispute. In our opinion, the Court correctly held that when the evidence showed that the conditions were different at the time the picture was taken, from what they were when the accident occurred, it was proper to exclude the photograph as evidence.

The appellants charge that the trial Judge committed error in refusing to allow them to introduce in evidence certified copies of official United States Navy and Veterans Administration and hospital and medical records of the respondent, as official records. It appears from the record that the appellants placed the custodians of the official records made by the Coast Guard, the United States Naval Hospital and the Veterans Administration on the stand and offered

the originals of the official records in evidence, along with photostatic certified copies of these records to be left with the Court. These records were excluded from evidence by the trial Judge.

It appears that the appellants had obtained an order from the Court of Common Pleas of Charleston County, South Carolina, in August, 1957, permitting them to inspect the clinical records of the respondent during the periods he was confined in various government hospitals, prior and subsequent to the accident here involved. The appellants were also permitted to inspect and copy the service record of the respondent as it related to his health and any physical injuries sustained. *Peagler v. Atlantic Coast Line R. Co.,* 232 S. C. 274, 101 S. E. (2d) 821.

It appears that the respondent was an enlisted man in the United States Coast Guard from 1942 through 1944. The appellants assert that during this period of service that he was confined on several occasions in a Naval Hospital and he was discharged from the Coast Guard because of physical disability and a neuro-psychiatric condition. They likewise assert that he was again confined in a Naval Hospital at Charleston from September 26 to October 14, 1953. The record shows that he was also confined at the Naval Hospital at Charleston from November 11, 1955 until November 17, 1955, and had been released from this hospital only two days prior to the injuries sustained as a result of his collision with the flatcar of the Railway Company. The appellants likewise assert that the respondent was in the Naval Hospital at Charleston from June 11 to June 18, 1956.

The appellants assert that the importance of the records, which were excluded by the trial Judge, is that they "strongly corroborated the testimony of the Defendant's witnesses that the Plaintiff was not in a fit condition to drive an automobile November 19, 1955, which was the night of the collision, and that the Plaintiff was actually drunk at the time of the collision. The records which were

excluded tie in and corroborate the records which have been admitted that show that the Plaintiff had been in the United States Naval Hospital at Charleston, South Carolina from November 11, 1955 until November 17, 1955, and had been released from the hospital two days prior to the collision after having been treated for *delirium tremens* and been a patient in the psychiatric ward in the hospital."

The record shows that the appellants called as a witness the custodian of the official records of the United States Coast Guard. These records showed the enlistment of the respondent in the United States Coast Guard, and also his hospital and medical history from 1942 through 1944. The record shows that the appellants had taken the deposition of a Dr. Campbell, who was at the Naval Hospital in 1943 and examined the respondent when he was discharged from the Coast Guard. When the deposition of this physician was offered in evidence, and upon objection thereto being made, counsel for the appellants stated: "Your Honor, if they object to it, we withdraw it, sir." It also appears that when the appellants attempted to offer evidence of the condition of the respondent while he was in the Naval Hospital in Charleston from June 11 to June 18, 1956, and upon objection being made, counsel for the appellants stated to the Court: "Your Honor, we will withdraw the 1956 testimony, so that will dispose of that." It thus appears that where counsel voluntarily withdrew the proffered evidence as to the respondent's condition from 1942 through 1944, and in June 1956, that no error could be assigned because such evidence was not admitted.

The appellants presented as a witness Dr. John K. Robertson, who testified that he treated the respondent during the period of time that he was confined in the Naval Hospital at Charleston from September 26 to October 14, 1953. We quote a portion of his testimony:

"Q. For what did you treat Mr. Peagler? A. *Delirium Tremens.*

Q. And what was the cause of that? A. Prolonged and excessive use of alcohol, then withdrawal from the same."

\* \* \*

"Q. And what was your diagnosis, in nontechnical terms, as to what had happened to him as a result of his excessive drinking? A. I felt he had brain damage from it."

The record shows that the appellants also called as a witness Dr. J. Wilson who was the Chief of the neuro-psychiatry service at the Charleston Naval Hospital while the respondent was in the said hospital in 1953. This witness, after refreshing his memory from the hospital records, testified that he prescribed certain medication and care for the respondent. His testimony was as follows:

"Q. Well, what was that medication and care for? A. At that time, these were routine orders that took care of a disturbed state such as *delirium tremens*.

"Q. And what was that *delirium tremens* caused from? A. The most common cause of *delirium tremens* is prolonged indulgence in alcoholic beverages, failure to maintain adequate nourishment, and then sudden withdrawal from alcohol over a period of hours a day."

\* \* \*

"Q. Well, now, what was he in your ward for at that time, and which day did he come into your ward? A. May I refer to these to refresh myself?

Q. Yes, sir. A. He was on my ward from 9/28/1953 to 10/1/1953; the reason for his transfer from the surgical ward, where he had been admitted, was an apparent sudden onset of confusion and agitation, to the point where it could not be controlled on the open surgical ward.

Q. Now, when you saw him, what was his condition, and what was your diagnosis, Doctor? A. I meant to say, sir, I don't recall seeing him immediately when he was transferred; I saw him on the 29th, at which time I prescribed the then recognized treatment for his condition.

Q. And what was that condition? A. *Delirium Tremens*.

Q. Did you, as head of the neuro-psychiatric service— that was Ward E, wasn't it? A. Yes, sir.

Q. —Approve a summary and review it with the doctors in your ward?"

* * *

"Q. Do you have to approve that, as head of the psychiatric service? A. I do.

Q. Was it based on your own knowledge? A. Partly my knowledge, from the time I prescribed for him on the 29th; chiefly from Dr. Robertson's knowledge as he conferred with me."

* * *

"Q. What was your diagnosis, then, Doctor? A. You want it in simple terms, sir, or the technical terms that—?

Q. Tell us both, please. A. The technical term was disorder, psychotic, with demonstrable physical idiology or associated structural change in brain (*delirium tremens*).

Q. All right, will you explain that in the layman's language? A. In less complicated terms, it could simply be *delirium tremens,* as described in the case.

Q. Well, how does a person with *delirium tremens,* act? A. Taking down the diagnosis into its component parts, *delirium* refers to his difficulty in—to his inability to realize where he is, what he's doing, his lack of contact with the world about him for the time being; the *tremens* part of the diagnosis refers to shaking, trembling, uncontrollable motor activity, in the agitation of the brain."

This same physician testified that a psychotic person is a crazy one. He stated that he was unable to say whether the respondent's condition in 1953 would have anything to do with his condition in 1955.

The appellants presented as a witness, by deposition, Dr. C. A. Paulsen, who testified that he was a medical officer at the Naval Hospital in Charleston, South Carolina, in November 1955. He identified the clinical record of the respondent in the hospital and stated that it was "a narrative summary." He also testified that he had occasion to see and

observe the respondent as a patient in the hospital. He testified that the behavior of the respondent, because he had been irrational and agitated, was related to organic brain syndrome, and gave the following testimony:

"Q. And will you explain for the court and jury in this case what you mean by the words 'organic brain syndrome'? A. Organic brain syndrome refers to a disease entity which can be caused by any toxic agent or a disease of the arteries such as seen in patients of advanced age and that this disease entity consists of an actual psychotic behavior insofar as the individual suffering from this is out of contact as to the time and place and events. He may actually be hallucinating, which refers to seeing things that arent't there, and this may be due to alcohol; it becomes a predominant feature. It is qualified further, this syndrome, as acute alcohol hallucinosis."

"There is also further continuation of the disease entity, delusions. In other words, the individual believes firmly in his mind that certain things are fact when they are not. Do I make myself clear?

Q. Now, Doctor, did you have occasion to see and observe this patient later that day? A. Yes. I have another note in my handwriting on the 14th.

Q. Which appears on the reverse side? A. It appears on the reverse side of page 18, which states:

'While on sick call patient came down to the isolation rooms quite agitated. He was delusional and actively hallucinating, i. e., answering people that weren't present. It was necessary for his safety to forcibly restrain him and this was done without injury to the patient or staff. NP service contacted and patient transferred to locked ward under restraints. Just before transfer, he cleared considerably and was allowed to eat lunch without arm restraints.' "

Dr. Paulsen also testified that from his own observation of the conduct of the respondent that he was delusional and actively hallucinating. He testified that the respondent was

"answering people that weren't there. He was turning his head, answering people that were not present."

This physician testified that it was his opinion that when the respondent was discharged on November 17, 1955, from the hospital, that he should not be let out of the hospital without some competent person to take care of him. He further testified:

"Q. Do you have an opinion, Doctor, based upon reasonable medical certainty whether or not this man was a fit person to be driving an automobile?

Mr. Goldberg: We object to that.

Q. At the time that you examined him?

Mr. Goldberg: We object to that question; he is not qualified as an expert. A. In my opinion, at the time I examined him, since there is the possibility, even though at the time that I examined him that he was clear, since there is a possibility of confusion, recurrence of the confusion and an unpredictable nature which nobody can predict, it would seem in my opinion since I stated that he should have attendants, I deemed it unwise for this patient to go under his own power, whether it be in a bus, by himself, or whether it be walking in the street or whether it be driving a car. In other words, as I stated, the confusion could arise at any time.

Q. And do I understand that that answer likewise applies to your previous statement that this confusion might arise at any time up to six weeks? A. It may persist for any time up to six weeks and after that it may be perfectly all right. There may be complete orientation during the daytime but in the evening, there may be some problem. In other words, there may be some confusion, to be specific."

The respondent admitted, under cross examination, that when he was in the Naval Hospital in November, 1955, that he was in Ward E, the psychiatric ward, and that he had *delirium tremens*. He likewise admitted that he had had *delirium tremens* two or three times prior to November 1955. One of the physicians, who attended the respondent for the injuries he sustained in the collision with the flatcar of the

railway company, testified that Peagler was in an extremely upset condition but that he could not say that he was psychotic. However, he did express an opinion that the disturbed condition of the respondent could have been attributed to *delirium tremens*. The ambulance attendant, who accompanied the respondent from the scene of the collision to the hospital, expressed the opinion that Peagler was drunk.

It is proper that we point out that the physicians, whose testimony has been quoted above, testified only after being refreshed by the hospital records. The introduction of the hospital records would simply have been cumulative evidence of what had already been given orally in testimony. We have held in numerous cases that it is not error for the trial Judge to exclude evidence which is merely cumulative. *Ford v. New York Life Ins. Co.,* 176 S. C. 186, 180 S. E. 37, and the cases therein cited.

The stated purpose of the appellants, in introducing the hospital records relating to the respondent, was to show that he was suffering from a psychotic disorder and *delirium tremens* to such an extent that he was not in fit condition to drive an automobile at the time of his injuries, and that he was actually drunk at the time of the collision.

The trial Judge permitted the appellants to prove by the oral testimony of the physicians that the respondent was suffering from a psychotic disorder and that he had *delirium tremens*. The respondent also admitted that he had suffered on several occasions from *delirium tremens*. The refusal of the Court to admit the hospital records could not have prejudiced the appellants because the introduction, by them, of the testimony to the same effect was allowed. Error cannot be predicated on exclusion of evidence which is afterwards given by other witnesses. *Pierce v. Marion County Lumber Company,* 106 S. C. 387, 94 S. E. 865. *Mulligan v. Atlantic Coast Line R Co.,* 104 S. C. 173, 88 S. E. 445. *Goudelock v. Prudential Ins. Co. of America,* 219 S. C. 284, 65 S. E. (2d) 114.

The hospital records excluded by the trial Judge were made by many physicians and other employees in said hospitals. Dr. Paulsen referred to these records as "a narrative summary." They contain records of the history of the patient made pursuant to investigations and inquiries from the various staff officials of the hospitals and from members of the family of the respondent. These records likewise contain many expressions of opinion and conclusions concerning causes and effects, which involves the exercise of judgment and discretion. We think the records were inadmissible in evidence.

In the case of *State v. Pearson,* 223 S. C. 377, 76 S. E. (2d) 151, and in the case of *Griggs v. Driggers,* 230 S. C. 97, 94 S. E. (2d) 225, this Court quoted with approval from the case of *Cmmonwealth v. Slavski,* 245 Mass. 405, 140 N. E. 465, 469, 29 A. L. R., 281, the following:

"The principle which seems fairly deducible from them is that a record of a primary fact made by a public officer in the performance of official duty is or may be made by legislation competent *prima facie* evidence as to the existence of that fact, but that records of investigations and inquiries conducted, either voluntarily or pursuant to requirement of law, by public officers concerning causes and effects and involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are not admissible as evidence as public records."

We conclude that even though the proffered documents of the hospital records of the respondent in form complied with section 26-101 of the 1952 Code of Laws of South Carolina, their admission in the evidence would clearly have been a violation of the best evidence rule. We think the trial Judge committed no error in excluding the hospital records from the evidence.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER, and LEGGE, JJ., concur.